**FOREST OIL CORPORATION,**
**Appellant,**

v.

**EAGLE ROCK FIELD SERVICES,**
**LP, Appellee.**

No. 14–10–00558–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Aug. 16, 2011.

Thomas A. Zabel, Holly May Dobbs Arnold, Houston, for appellant.

Gregory Preston Propes, Houston, Dennis Clarke Cameron, Tulsa, OK, for appellee.

Panel consists of Justices ANDERSON, BROWN, and CHRISTOPHER.

## OPINION

JEFFREY V. BROWN, Justice.

Forest Oil Corporation appeals the trial court's take-nothing judgment in favor of Eagle Rock Field Services, LP, on Forest Oil's breach-of-contract and waste claims arising out of a gas-purchase agreement. In four issues, Forest contends the trial court erred by granting Eagle Rock's motion for summary judgment and denying Forest's motion for partial summary judgment, concluding that Eagle Rock did not commit waste, and overruling Forest's objection to the admission of extrinsic evidence of the contracting parties' intent when construing an unambiguous agreement. For the reasons explained below, we affirm.

I

Forest and Eagle Rock are successors to a gas-purchase agreement originally executed by Peak Operating of Texas, LLC, and ONEOK Texas Fields Services, L.P., on October 1, 2003. Under the agreement, Forest (Peak's successor) agreed to sell gas produced from wells on specified lands and leases in Texas to Eagle Rock (ONEOK's successor). In 2003, the agreement was amended to cover additional lands and leases and to amend the payment terms. As amended, the agreement entitled Forest to receive compensation for eighty-five percent of the natural-gas liquids ("NGLs") and residue gas up to a certain quantity, and ninety-two percent of the NGLs and residue gas exceeding that quantity. The agreement terminated according to its terms on September 30, 2008.

In 2007, Forest sued Eagle Rock for breach of contract, breach of duty, waste, and confusion of goods. Forest contended that Eagle Rock breached the agreement by failing to pay to Forest the value asso-

ciated with liquids that condensed within Eagle Rock's compression facilities and within Eagle Rock's Arrington Plant where the gas was processed and sold. Forest's primary complaint was that, under the terms of the agreement, Eagle Rock's compression of Forest's gas through "mechanically induced changes in pressures and temperatures" constituted "processing"—a term not defined in the agreement—resulting in the recovery of NGLs for which Forest should be compensated. Forest also alleged that Eagle Rock wrongfully allowed significant volumes of NGLs to evaporate from its compression facilities in breach of its common-law duty to perform its contractual obligations with skill and care and in a good and workmanlike manner.

In November 2008, Eagle Rock moved for summary judgment, asserting that the agreement's unambiguous language precluded all of Forest's claims. Forest responded and argued, among other things, that Eagle Rock misconstrued the agreement and ignored controlling, defined terms that supported Forest's interpretation of the agreement. The trial court denied Eagle Rock's motion, concluding at the time that as both Eagle Rock and Forest had presented ostensibly reasonable interpretations of the agreement, the agreement was ambiguous.

In October 2009, after conducting further discovery, Eagle Rock again moved for summary judgment on all of Forest's claims. In response, Forest moved for partial summary judgment against Eagle Rock. The trial court declined to rule on these motions, and the parties proceeded to a non-jury trial. Over three days, the parties presented various witnesses (both live and by deposition), including corporate representatives, experts, and the individuals who originally negotiated the agreement on behalf of Peak and ONEOK.[1] At the trial's conclusion, the trial court asked the parties to submit post-trial briefing summarizing their closing arguments and instructing them to specifically address the liability and damages theories. Forest and Eagle Rock complied.

On May 20, 2010, the trial court entered a take-nothing judgment in favor of Eagle Rock. The trial court also filed extensive findings of fact and conclusions of law in which it explained that, upon further examination, it concluded that the agreement and the term "processing" were unambiguous, and granted Eagle Rock's November 2008 motion for summary judgment. Alternatively, the court determined that even if the agreement were ambiguous, Forest's claims still failed as a matter of fact and by virtue of applicable case law. This appeal followed.

## II

On appeal, Forest asserts that the "clear language" of the agreement dictates that hydrocarbon liquids extracted and recovered from Forest's gas stream from compression involving mechanically induced, significant pressure increases and temperature changes are the result of "processing" within the plain, ordinary use of the word, as well as within the context of oil and gas industry custom and usage. As a matter of law, Forest contends, these liquids are contractual NGLs for which Forest is entitled to compensation under the agreement.

Eagle Rock responds that the agreement unambiguously requires Forest to maintain delivery pressures sufficient to enter Eagle Rock's gathering system and to refrain from processing the gas before delivering it to Eagle Rock. Eagle Rock contends that, because the parties contem-

---

1. The reporter's record also includes five volumes of exhibits.

plated that Forest may be required to compress its gas before delivery to maintain the agreed delivery pressure, its use of compression could not be considered "processing" under the unambiguous terms of the agreement, because only Eagle Rock was permitted to perform processing. And, even if the agreement is ambiguous, the evidence adduced at trial, including the intentions of the contracting parties, supports the judgment.[2] Further, because Forest's waste claim is derivative of its contract claim, it too must fail.

For the reasons explained below, we conclude that the trial court correctly determined that, as a matter of law, the term "processing" as applied to the agreement does not include compression. Therefore, the trial court did not err in granting Eagle Rock's November 2008 motion for summary judgment.

### A

In a traditional motion for summary judgment, the movant has the burden to show there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). In determining whether there is a genuine fact issue precluding summary judgment, evidence favorable to the non-movant is taken as true and the reviewing court makes all reasonable inferences and resolves all doubts in the non-movant's favor. *Id.* at 548–49. If there is no genuine issue of material fact, summary judgment should issue as a matter of law. *Haase v. Glazner*, 62 S.W.3d 795, 797 (Tex.2001). We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005).

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex.2006). We presume the parties to the contract intended every clause to have some effect. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co.*, 164 S.W.3d at 662. We construe contracts from a utilitarian standpoint, bearing in mind the particular business activity sought to be served. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex.2005). We will avoid, when possible and proper, a construction which is unreasonable, inequitable, and oppressive. *Id.*

Whether a contract is ambiguous is a question of law. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). A contract is ambiguous when its meaning is uncertain and doubtful or reasonably susceptible to more than one interpretation. *Heritage Res., Inc.*, 939 S.W.2d at 121. A contract is not ambiguous simply because the parties advance conflicting interpretations. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). We determine whether a contract is ambiguous by looking to the contract as a whole in light of the circumstances present when the parties executed it. *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981). If a contract is not ambiguous, courts must enforce it as written without considering parol evidence for the purpose of creating an ambiguity or giving the contract "a

**2.** Eagle Rock also notes that Forest does not challenge the legal and factual sufficiency of the evidence.

meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex.2008) (per curiam). The contract is not ambiguous if it can be given a certain or definite meaning as a matter of law. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex.2003).

## B

### 1

To place the terms of the agreement in context, we draw the following background facts from the summary-judgment record and the trial court's unchallenged findings of fact. Under the agreement, Forest agreed to sell and Eagle Rock agreed to buy and process natural gas produced from lands or leases owned by Forest in the Texas Panhandle. Forest delivered its gas from numerous wells to two receipt points known as the Peak–Johnson (or Peak) and Finsterwald central delivery points (the "CDPs"). Forest did not compress the gas before delivering it to Eagle Rock. After reaching the CDPs, Forest's gas entered Eagle Rock's gathering system and was transported to the Mesa Compressor Station. Here, compression was used to lower the pressure at the inlet of Eagle Rock's gathering system so that greater volumes of gas could enter the system from Forest's wells.

Before the gas stream could be compressed, it was necessary to remove hydrocarbon liquids (and water) from the gas to avoid damaging the compression equipment. At the Mesa Compressor Station, the gas first passed through an inlet separa-

rator, where liquid hydrocarbons condensed and were separated from gaseous elements principally by gravity, with the heavier liquids falling to the bottom of the separator and the gas rising to the top. The liquids were removed and transferred to storage tanks.[3] The gas then passed through multiple stages of compression involving mechanical compressors and cooling fans, which raised the pressure and changed the temperature of the gas. Additional separators were used to remove from the gas stream any additional liquids that formed as a consequence of compression.[4] The liquids recovered were transferred to the storage tanks.

After passing through the Mesa Compressor Station, the gas was then transported via pipeline several miles to a fenced-in area identified generally as Eagle Rock's "Arrington Plant." The fenced-in area contained additional compression facilities and separators where Eagle Rock recovered additional liquids from the gas and stored it in tanks. After the gas was compressed to a sufficient pressure, the compressed gas entered Eagle Rock's lean-oil facility within the Arrington Plant. At this point, the gas still contained many liquids present in the gaseous phase that remained in the gaseous phase upon delivery to the lean-oil facility. At the lean-oil facility, the liquids remaining in the gas stream were extracted through refrigerated lean-oil processing, in which lean oil bonds with the entrained liquids to remove them from the gaseous phase and convert them to the liquid phase. The NGLs this process yielded were removed and discharged into a pipeline at the tailgate of the plant for sale.

---

**3.** Forest alleged that hydrocarbons were also vented into the atmosphere from these tanks, which was the basis for Forest's waste claim. Eagle Rock apparently transferred the liquids collected to a truck for sale to third parties.

**4.** Forest's expert, Randall Blank, opined that the liquid components recovered during this process included those that comprise NGLs under the agreement.

Both Forest and Eagle Rock agree that all liquids the lean-oil process extracted are the product of "processing" and are contractual NGLs for which Forest is entitled to payment. Forest makes no claim that it was not properly paid for the liquids extracted through the lean-oil recovery process at the Arrington Plant.

### 2

Under the agreement, Forest agreed to contract exclusively with Eagle Rock "for the purchase of [Forest's] Gas [5] and the right to process and extract Natural Gas Liquids attributable to [Forest's] Gas" from wells on specified lands and leases. "Natural Gas Liquids" or "NGLs" are defined in the agreement as "those liquid hydrocarbons extracted from the Gas from processing." [6] But "processing,"—the term central to this dispute—is not defined, even though the words "process," "processed," and "processing" are used throughout the agreement. Therefore, reviewing the agreement as a whole in light of the circumstances present when the parties executed it, we must determine whether the meaning of "processing" may be determined as a matter of law.

Under section 4.1.3 of the agreement, Forest reserved the right to "retain all liquids and Condensate separated from the Gas by the use of typical volumetric (non-refrigerated) oil and Gas separators prior to the delivery of the Gas to [Eagle Rock] at the specified "Receipt Point(s)." [7]

"Condensate" is defined as "the liquid hydrocarbons that are recovered from the Gas in typical oil and Gas separators or pipeline drips, usually from changes in ambient or ground temperature and/or pressure, but not from processing." [8] Thus, Forest was entitled to retain liquid hydrocarbons constituting condensate recovered from its own separators before delivery to Eagle Rock, but not liquid hydrocarbons removed through processing.

Further, in section 4.2.1 of the agreement, Forest specifically agreed to "grant, assign, and convey to [Eagle Rock] exclusive processing rights for the recovery of Plant Products for Gas delivered to [Eagle Rock] for processing at the Receipt Points." "Plant(s)" were defined as "Gas processing facilities where Natural Gas Liquids and other Plant Products are separated from the Gas." "Plant Products" were defined as "the Natural Gas Liquids and helium, if any, as extracted from processing." Accordingly, the parties contemplated that NGLs would include only those liquid hydrocarbons separated or extracted from the gas through processing, and only Eagle Rock had the right to process the gas. Consistent with this understanding, Forest also expressly agreed that it "shall not process the Gas or allow the Gas to be processed" before delivery to Eagle Rock for processing.

Under the agreement, Forest was entitled to receive compensation for eighty-five percent of the NGLs "saved and sold at the Plant(s)" [9] and "Residue Gas" "sold at

---

5. "Gas" or "gas" is defined in the agreement as "natural gas as produced from Wells in its natural state that meets the quality specifications of Article V" of the agreement.

6. The definition of NGLs also identifies the NGLs' "components" as "ethane, propane, isobutane, normal butane, natural gasolines and incidental methane and other miscellaneous liquids that become associated with the NGL's [sic]."

7. "Receipt Point(s)" means "the inlet flange of [Eagle Rock's] pipeline facilities installed to take deliveries of Gas from [Forest]."

8. Condensate from "pipeline drips" is not at issue in this case.

9. Specifically, Forest's compensation for NGLs was based on a percentage of "NGL Products" determined as follows:
   *SELLER's NGL Products* shall be determined by multiplying the total quantity of

the tailgate of [Eagle Rock's] Plant(s)," up to a total monthly MCF of 185,000.[10] If Forest delivered total monthly volumes in excess of 185,000 MCF, then Forest was entitled to receive compensation for ninety-two percent of the NGLs and residue gas. However, under Section 4.2.2 of the gas purchase agreement, "Condensate" recovered by Eagle Rock "downstream of the Receipt Point(s)" belonged to Eagle Rock. This section provided that "[t]itle to the Condensate shall pass to [Eagle Rock] upon its recovery by [Eagle Rock] and shall be free and clear of all liens, claims, and encumbrances created by, through or under [Forest]." The central issue in this case, therefore, is whether the liquids at issue are NGLs for which Forest is entitled to compensation. Significantly, the agreement also contained certain requirements for delivery, compression, and pressures. The relevant sections are as follows:

3.4.1. Transitional Contract Volume.

(a) *Initial Deliveries and Pressures.* Commencing with the effective date of the Agreement ("Effective Date"), [Forest] may deliver up to 3,000 Mcf/d at the Receipt Point specified in the Agreement at pressures sufficient to enter [Eagle Rock's] system. [Eagle Rock] estimates the line pressure to range between 95–150 psig. Simultaneously, [Eagle Rock] will (i) commence acquisition of a site for a compressor station to be located in Section 59, Block M–1, H & GN Survey, Hemphill County, Texas downstream of the Receipt Point and (ii) initiate the necessary permitting process for the future installation of compression facilities at such site.

(b) *High Pressure Deliveries.* Commencing no later than ten (10) days after the volume delivered at the Receipt Point(s) equals 3,000 Mcf/d, [Eagle Rock] will proceed to modify its system so as to provide delivery capacity to [Forest] at the Receipt Point(s) of up to 10,000 Mcf/d at pressures of approximately 450 psig.

(c) *Reduced Pressure Deliveries.* At any time after the Effective Date at such time as [Forest's] daily volume exceeds 3,000 Mcf/d, [Forest] may notify [Eagle Rock] of [Forest's] desire that [Eagle Rock] install compression facilities in order for [Eagle Rock to] accept deliveries consistent with the volume and pressure provisions of the 3.2.1 and 6.1 hereof. [Forest] will provide all necessary projections of future production in order for [Eagle Rock] to maximize the efficiency of its compression facilities consistent with its contractual obligations. No less than four (4) months following the receipt of [Forest's] notice, [Eagle Rock] will be prepared to take deliveries of natural gas under this Agreement pursuant to such provisions. . . .

each NGL Component saved and sold at the Plant(s) by a fraction, the numerator of which shall be the theoretical gallons of such Component contained in SELLER's Gas delivered at the Receipt Point(s) and the denominator of which shall be the total theoretical gallons of each Component contained in all Gas delivered to BUYER's facilities upstream of the Plant(s).

*Net NGL Proceeds* shall be [the] sum of each Component of SELLER's NGL Products multiplied by the Monthly Average NGL Sales Price of each Component.

*Monthly Average NGL Sales Price* shall mean the average net prices received by BUYER f.o.b. BUYER's Plant for the sale of each NGL Component.

10. Under the agreement, "Residue Gas" means "the total quantity of MMBTU's of gas (both processed and unprocessed) sold at the tailgate of [Eagle Rock's] Plant(s). "MMBTU" means "one million (1,000,000) British Thermal Units. "MCF" means "one thousand (1,000) Cubic [Feet] of Gas."

6.1 *Delivery Pressures.* Commencing with the installation of facilities pursuant to 3.4.1(c) hereof, [Forest] shall deliver Gas to [Eagle Rock] at the Receipt Point(s) at a pressure sufficient to enter [Eagle Rock's system against the operating pressure as it exists from time-to-time, but not to exceed 150 psig.

In its findings of fact, the trial court found the delivery, pressure, and compression provisions central to its determination that processing could not include compression. As the court explained:

The Agreement expressly states that either Peak (or, subsequently, Forest) may, pursuant to ¶ 3.4.1 and ¶ 6.1, have some obligation to compress its production. That is, Peak/Forest had the clear and express right under the Agreement to compress its production and, under certain situations, may have had the obligation to do so. Given that the Agreement expressly precluded "processing" by Peak/Forest and expressly reserved all processing rights to [ONEOK]/Eagle Rock (¶ 4.2.1), the Agreement clearly and unambiguously and as a matter of law provides that the use of compression—whether in Peak/Forest's gathering system or [ONEOK]/Eagle Rock's gathering system—could not possibly be an act of "processing." Thus, Eagle's compression could not be processing because Forest's right and obligation to compress cannot be processing as a matter of contractual construction. The fact that Forest never actually compressed is immaterial to this analysis. It had the right under the Agreement to do so. That is all that matters.

Because the Agreement precludes "processing" by Peak, liquids that condensed within Eagle Rock's gathering system after compression but prior to the Arrington Plant's lean oil facilities could not be NGLs. They were, therefore, contractual Condensate and this Condensate belongs exclusively to Eagle Rock. Therefore, because Forest has no claim to a "percentage of proceeds" earned from Eagle Rock's sale of contractual Condensate, this Court finds no breach of contract as a matter of law from the contractual interpretation of this unambiguous agreement. Therefore, for the reasons stated herein and for the reasons stated in Defendant's Motion for Summary Judgment, the Court *GRANTS* Defendant's Motion for Summary Judgment.

Forest contends the trial court's conclusion is erroneous because, in light of the agreement's definitions of "Plant(s)" and "NGLs," processing necessarily includes Eagle Rock's removal of NGLs through field compression and the subsequent separation of liquids and compression within the Arrington Plant. Specifically, Forest contends, these definitions reflect that "processing" is the method by which Eagle Rock mechanically separates NGLs and other products from Forest's gas.

As noted above, NGLs are defined as "those liquid hydrocarbons recovered from the Gas from processing" and include "ethane, propane, iso-butane, normal butane, natural gasolines and incidental methane and other miscellaneous liquids that become associated with the NGL's [sic]." "Plant(s)" are defined as "Gas processing facilities where Natural Gas Liquids and other Plant Products are separated from the gas." Therefore, Forest asserts, "processing" means "those methods by which Eagle Rock separates NGLs and other Plant Products from Forest's gas," including the use of mechanical compression which results in the extraction and recovery of the same types of liquid hydrocarbons which comprise NGLs under the agreement. Forest distinguishes the inlet separator of the Mesa Compressor Station,

where gravity and changes in ambient temperatures or pressures caused liquids to fall out, from the compression process, which "subject[ed] the gas to mechanically-induced changes in temperatures and pressures."

In support of its conclusion, Forest points out that the term "Plant(s)" is not defined by reference to any specific geographical area, process, or equipment, and it is not limited to include only the lean-oil facility at the Arrington Plant. Forest asserts it is undisputed that compression, both in the field and inside the lean-oil facility, was integral to the entire operation and, accordingly, comprises a part of the Arrington Plant. Thus, under Forest's construction, the Mesa Compressor Station and the separators and compressors inside the fenced-in area, but before the lean-oil facility, fall within the definition of "Plant(s)," which specifically includes any facilities where processing occurs. Forest contends that even the definition of "Condensate" contemplates that liquids recovered in separators through means other than changes in ambient temperatures or pressures [11] would be processed liquids.

Forest also maintains that its construction of "processing" comports with the term's plain, ordinary meaning as well as oil and gas industry custom and practice. Forest points to Webster's Dictionary definition of "processing" as "to subject to a particular method, system or technique of preparation, handling or other treatment designed to effect a particular result . . . to prepare for market, manufacture, or other commercial use by subjecting to some process." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002). In light of the plain, ordinary meaning of processing, Forest contends, "it follows that the methods and techniques used to get Forest's gas from the wellhead to the tailgate of the Main Plant ready for market, which specifically include field compression, and to deliver the gas to the Arrington Plant at sufficient pressure to allow the efficient separation and extraction of additional liquids [from] the residue gas stream to exit the tailgate of the Plant at a sufficient pressure to enter the sales line, constitute processing of the gas." Forest also points out that its expert, W. Randall Blank, opined that Eagle Rock's compression of the gas meets the definition of processing as it is commonly understood in the oil and gas industry.

In response, Eagle Rock contends that Forest's urged understanding of "processing" cannot be reconciled with the agreement's other terms, and the trial court correctly construed the agreement as a matter of law. Eagle Rock's principal argument in its motion for summary judgment proceeded on a few material facts, none of which Forest disputed. These facts included the following: (1) Forest's contractual obligations to Eagle Rock include the obligation to deliver gas "at pressures sufficient to enter [Eagle Rock's gathering] system"; (2) the agreement estimates the line pressure of Eagle Rock's gathering system "to range between 95–150 psig"; and (3) Eagle Rock expressly reserves all rights to process the gas Forest delivered.

■ Eagle Rock then explained that the undefined term "processing" could not include Eagle Rock's use of gathering-system compression. Under the agreement,

---

11. Forest's expert, W. Randall Blank, averred that "ambient temperature and pressure" refers to "atmospheric temperature and pressure." He further opined that the inlet separator at the Mesa Compressor Station "uses no mechanical means to cause a change in temperature or pressure in order to recover any liquids from the gas stream, but relies on gravity and changes in ambient pressure and temperature to separate liquids from the gas."

Forest was obligated to deliver gas "at pressures sufficient to enter [Eagle Rock's gathering] system,"—i.e., at pressures sufficient to overcome Eagle Rock's gathering system pressures of 95–150 psig. The terms Peak negotiated thus meant that Forest could be required, at some point, to utilize compression before delivery to Eagle Rock to meet its own delivery obligations. At the same time, Forest was contractually precluded from processing any gas delivered to Eagle Rock, as only Eagle Rock was authorized to engage in "processing." Because Forest is entitled (and potentially obligated) to use compression before delivery, Eagle Rock argued, its use of compression could not be "processing" because Forest was contractually precluded from processing the gas prior to delivery.

In addition to the plain language of the agreement, Eagle Rock also relied on the testimony of Forest's Senior Vice President of Marketing, Blaine Wofford, who was deposed as a corporate representative of Forest. In his testimony, Wofford acknowledged that under the agreement Forest may be required to compress its gas to deliver it to Eagle Rock:

Q. [Eagle Rock's counsel]: Okay. Let's look at Initial Deliveries and Pressures. That's 3.4.1(a). And take a minute to look at that if you want.

A. [Wofford]: Okay.

Q. It appears to me when reading this, when this contract was first written, that the seller was permitted to deliver up to 3,000 Mcf a day at the receipt points. Do you see that?

A. That's correct.

A. And it says, "at pressures sufficient to enter Buyer's system." Do you see that?

A. That's correct.

Q. If, for example, the pressure for that delivery was below what was on the buyer's system, the producer had to increase that pressure, correct?

A. If it was below the 95 pounds.

Q. Yeah. If the seller's gas for this 3,000 a day was not sufficient to enter [the] buyer's system, the seller had to increase the pressure, correct?

. . .

A. Correct.

Q. And how would a producer do that?

A. Either the—either the natural flowing pressure of the wells would allow it to go ahead and enter the system and/or you would set additional compression behind the central delivery point.[12]

Wofford thus further confirmed that, under the agreement, Forest could install compression if necessary to deliver its gas at sufficient pressure to enter Eagle Rock's gathering system. He also confirmed that compression of the gas in the field constituted processing under Forest's definition—something Forest is contractually prohibited from doing.[13] This testimony highlights the internal inconsistency of Forest's argument. As Forest was contractually permitted to compress its gas before delivering it to Eagle Rock at the

---

**12.** At trial, Wofford testified similarly. He also admitted that Forest's gas passes through a separator before delivery to Eagle Rock, and Forest's recovery of condensate through the use of that separator would constitute "processing" under Forest's definition—something Forest is contractually prohibited from doing.

**13.** The agreement also expressly contemplated that Forest could install compression facilities. In section 3.1.3, Forest expressly reserved the right "[t]o use Gas "as fuel in the operation of [Forest's] compression, dehydration, or treating facilities, if any installed for the delivery of Gas hereunder."

CDPs, then the act of compressing the gas could not be "processing" as Forest broadly defines the term, because Forest is expressly prohibited from processing its gas before delivery to Eagle Rock.

Based on the summary-judgment record, we conclude that Eagle Rock's interpretation of "processing" as applied to the agreement is the only reasonable interpretation, as Forest's interpretation is internally inconsistent and contrary to the parties' intended use of the word. Therefore, as a matter of law, Eagle Rock's use of compression cannot be contractual "processing."

Forest contends this conclusion is erroneous, however, because Forest never installed compression and never contemplated doing so, as it never thought compression would be necessary given the low delivery pressure specified in the agreement. Further, Forest points out that Wofford averred that Forest would abandon the wells as uneconomical before they reached a flowing pressure less than that needed to enter Eagle Rock's pipeline. Forest also asserts that it did not expressly reserve the right to install compression because it knew it would never be necessary given that the agreement placed the obligation to perform compression on Eagle Rock, not Forest.

But as the trial court correctly concluded, the fact that Forest never actually compressed its gas is immaterial; what is material is that Forest had the right to do so. For the same reason, Forest's argument that the definition of "Plant(s)" includes facilities where NGLs are "separated" from gas and thus includes compression facilities is likewise unpersuasive. To be a "Plant" under the agreement, such facilities must be "gas processing facilities," and gathering-system compressors cannot be "gas processing facilities" as that term is used in the agreement for

the reasons stated. And, the interpretation of the agreement does not change due to the fact that Eagle Rock's multistage compression results in the heating and cooling of the gas stream. Because gathering-system compression is not "processing" as that term is used in the agreement, those compressors cannot be contractual "Plants." Nor can any liquids that condense after compression but prior to lean oil processing be liquids that were "saved and sold at the Plant(s)."

Our conclusion is buttressed by a recent Supreme Court of Texas decision, *Dynegy Midstream Services, L.P. v. Apache Corp.*, 294 S.W.3d 164 (Tex.2009). In that case, Apache (as seller) and Versado (as buyer) were parties to eighteen different gas-purchase agreements through which Apache sold gas on a percentage of proceeds basis to Versado. *Id.* at 166. Gas sold by Apache was delivered into Versado's gathering systems, at which point title to the gas passed to Versado. *Id.* Versado's gathering systems included "numerous compressor stations." *Id.* at 172. While traveling through Versado's gathering systems en route to any of Versado's three processing plants, some condensate formed and was collected by Versado. Apache was entitled to receive payment on the basis of a percentage of proceeds of NGLs "saved and sold" at the "plants" or "extracted through Plant processing." *Id.* at 173. Apache nonetheless claimed that Versado should pay Apache (1) for certain condensate formed and collected in Versado's gathering system, and (2) for gas that Apache characterized as "unaccounted for" gas. *Id.* at 167. The Supreme Court rejected Apache's condensate claim as to all of the contracts at issue, explaining:

Some of the contracts in issue do not define "plant," but six of them define the term as a facility where gas is processed. Unlike plants, the compressor

stations do not treat the liquids; the liquids merely collect at the station. Plants employ several stages or processes that include refrigeration or huge compressors to deliberately make liquids. The compressor stations are necessary to move gas to a plant, where the gas and liquids can be treated and sold to third parties. Compression at the plant is achieved through multi-stage compression and at higher pressure than compression at the North and South Eunice stations.

The contracts cannot be read to require Versado to compensate Apache for liquids that condense at the two compressor stations. First, all the contracts provide that title to the gas transfers to Versado at or near the Apache wellheads. Therefore, absent some more specific provision to the contrary, Versado owns any liquids that condense from the gas stream downstream of the wellheads, at the compressor stations or anywhere else. Second, all of the contracts in issue provide that Versado is only obliged to pay Apache for liquids "saved and sold" at the "plant" or, in one contract, to pay Apache for "Products" defined as liquids "extracted through Plant processing." As explained above, the compressor stations are not plants. Further, gas liquids were not "saved and sold" at the compressor stations. Third, ten of the eleven contracts expressly provide that any liquids exiting the gas stream en route to the final processing plants belong to Versado.

*Id.* at 172–73 (footnote omitted). Accordingly, the general conclusion of the *Dynegy* court is that Apache's condensate claim was contrary to the governing contract language, "which focuses on the gas sold, not gas delivered." *Id.* at 165. With respect to "percentage of proceeds" contracts, the court explained that such contracts "unambiguously base payment on

the amount of gas ultimately sold at the tailgate (not the amount initially delivered at the wellhead)." *Id.*

Forest contends *Dynegy* is distinguishable because the terms of the contracts at issue in were materially different from those of the agreement and the result is not universally applicable to all oil and gas cases involving disputes between producers and processors. Specifically, Forest first points out that in *Dynegy*, ten of the contracts at issue provided that Versado owned "all liquids" that dropped out of the gas stream before the first stage of compression at the plant, *see id.* at 173 & n. 36, when in contrast, under the agreement Eagle Rock is only entitled to retain Condensate. Forest also contends that the *Dynegy* contracts' defined terms "Gas Gathering System" (which is not defined in the agreement in this case) and "Plant" compel a different result. Forest further asserts that the compressor stations in this case go through the same processes that the *Dynegy* court ascribes to the plants in that case, through the use of the multistage compression involving mechanically induced changes in temperatures and pressures. *See id.* at 172–73 (stating that "[u]nlike plants, the compressor stations do not treat the liquids, the liquids merely collect at the station" and "[p]lants employ several stages or processes that include refrigeration or huge compressors to deliberately make liquids").

But, as the *Dynegy* court noted, all of the contracts at issue—much like the agreement—"provide that Versado is only obligated to pay Apache for liquids 'saved and sold' at the 'plant' or, in one contract, to pay Apache for 'Products' defined as liquids 'extracted through Plant processing.'" *Id.* at 173. And, as the court explained, "the compressor stations are not plants." *Id.* Rather, compressor stations "are necessary to move gas to a plant,

where the gas and liquids can be treated and sold to third parties." *Id.* Forest attempts to distinguish this case from *Dynegy* by asserting that the multistage compression at issue here is "integral to the entire process of the Arrington Plant, and not merely a method of delivery." [14] We decline to read *Dynegy* so narrowly. The relevant conclusion the *Dynegy* court reached was that, under the various contracts at issue, Versado was required to pay Apache for liquids produced and sold at the processing plants at the end of Versado's gathering system, but was not required to pay Apache for condensate that fell out of the gas stream at the compressor stations. *Id.*

We acknowledge that some of the specific terms of the *Dynegy* contracts differ from those in the agreement, but the ultimate conclusion the *Dynegy* court reached is consistent with our interpretation of the agreement, and therefore provides additional support for the conclusion that Eagle Rock's understanding of the agreement is the only reasonable interpretation as a matter of law. As in *Dynegy*, the "Plant" relevant to the agreement is a facility that yields NGLs after processing. And, for the reasons already explained, those NGLs that exist after lean-oil processing at the Arrington Plant are the only NGLs for which Eagle Rock is obligated to pay Forest under the agreement. Accordingly, Eagle Rock is not required to pay Forest for liquid hydrocarbons that fall out of the gas stream in separators used during compression at the Mesa Compressor Station

and the Arrington Plant before the gas is processed in the lean-oil facility for sale at the tailgate of the plant.

We note that the Texas Pipeline Association, as amicus curiae, has taken a position consistent with our resolution of this case.[15] The association contends that thousands of gas-purchase agreements entered into by their members rely on the accepted industry definition of "processing" to mean "the act of extracting liquids at a gas processing plant, not the incidental condensation of liquids at a compression facility." To suggest otherwise, the association maintains, "is to suggest that an entire pipeline system is a gas processing facility whose primary function is to extract liquids from a natural gas stream." The association asserts that broadening the definition of "processing" to include upstream compression "is contrary to accepted industry practice and would impose significant contractual burdens on [its] members and other industry participants who are parties to existing gas purchase agreements." Although we appreciate the association's position that compression is not synonymous with processing, as we have discussed, our conclusion is based on the language of the agreement and the summary-judgment record, as well as the *Dynegy* opinion.

Finally, Forest contends that, as a result of the trial court's incorrect interpretation of the agreement, it erred by concluding that Eagle Rock is not liable to Forest for waste. Forest's position is that Eagle

---

**14.** We note that the contracting parties fully anticipated that ONEOK would be required to build compression facilities to accommodate Peak's increasing volumes of gas ("at such time as SELLER's daily volume exceeds 3,000 Mcf/d, SELLER may notify BUYER of SELLER's desire that BUYER install compression facilities") and Forest's Blaine Wofford conceded that Eagle Rock's compression facilities served to benefit Forest as the producer be-

cause the compression lowers the pressure at which Forest must deliver the gas and saves Forest from having to compress the gas itself.

**15.** The TPA consists of thirty-nine members who, collectively, engage in the gathering, processing, and transmission of natural gas and hazardous liquids through pipelines in Texas.

Rock breached its duty to perform in good faith by wrongfully commingling NGLs with condensate and wasting Forest's NGLs by allowing them to evaporate. However, because we have concluded that Forest's entitlement to payment for residue gas and NGLs "saved and sold at the Plant(s)" does not extend to the liquid hydrocarbons that fall out of the gas stream during compression, Forest's claim for waste must fail as a matter of law as well.

\*　　\*　　\*

We overrule Forest's issues and affirm the trial court's judgment.