**Appellee's Motion for Rehearing Denied; Memorandum Opinion of November 15, 2012 Withdrawn; Reversed and Remanded and Substitute Memorandum Opinion filed December 18, 2012.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

_____

## NO. 14-11-01006-CV
_____

**INEOS USA LLC, Appellant**

**V.**

**BNSF RAILWAY COMPANY, Appellee**

---

**On Appeal from the 281st District Court
Harris County, Texas
Trial Court Cause No. 2010-07142**

---

## SUBSTITUTE MEMORANDUM OPINION

We deny appellee BNSF Railway Company's motion for rehearing, withdraw our previous opinion of November 15, 2012, and issue this substitute memorandum opinion.

In a single issue, appellant INEOS USA LLC argues that the trial court erred by granting BNSF's motion for summary judgment and denying INEOS's cross-motion for summary judgment. We reverse and remand.

## I. BACKGROUND

INEOS produces plastic commodities and ships them from locations in Texas and Oklahoma. During 2006, INEOS contracted with railway carrier BNSF to transport INEOS's plastics. INEOS and BNSF entered into a five-year transportation master contract ("Master Contract"), effective May 1, 2006 through April 30, 2011. Pursuant to provisions in the Master Contract, INEOS and BNSF intended to enter into a Transportation Service Agreement ("TSA") which would be part of the parties' agreement and govern routes, destinations, commodities, and rates. The Master Contract did not refer to or identify specific routes, destinations, commodities, or rates. Neither party contends the Master Contract was breached.

INEOS and BNSF entered into two TSAs, both of which were amended numerous times. Our record contains the following versions of the TSAs: (1) TSA 0001 Amendment 45, effective from May 28, 2009 to April 30, 2011 ("TSA 1"); and (2) TSA 0002 Amendment 47, effective from March 13, 2009 to April 30, 2009 ("TSA 2"). TSA 1 and TSA 2 contained the following identical "Minimum Volume Requirement" provision: "[INEOS] agrees to ship 95% of all its rail movements of the Commodities listed herein moving between the Origins and Destinations listed herein, via routes listed herein during each year this contract and/or amendments are in effect."

Under TSA 1, the destinations and rates for shipment of INEOS's plastics were divided into two sections: (1) "BNSF Rate Matrix," apparently providing rates to final destinations accessible by BNSF (meaning use of another railway carrier

was unnecessary); and (2) "BNSF Rule 11 Matrix," providing rates to destinations at which it was anticipated another carrier would assume shipment of the commodities and transport them to a final destination. The BNSF Rule 11 Matrix contained the following condition: "Price must be used in combination with other prices for the portion of the shipment subsequent to specified destination. Separate freight bills will be issued for each price used according to the provisions of Railway Accounting Rule 11." In an affidavit, a BNSF manager defined Railway Accounting Rule 11 as a railway shipping method in which

> the customer tenders the shipment to an originating rail carrier, the originating carrier takes the freight on the first leg of the trip, passes the freight to the second carrier at an interchange location, and the second carrier transports the freight to its final destination. . . . In a Rule 11 shipment, each of the railroads then submits separate invoices to the customer covering only that railroad's portion of the move.[1]

Accordingly, under the BNSF Rule 11 Matrix, INEOS and BNSF agreed to rates pursuant to which BNSF would transport plastics to interchange locations, and it was understood that the subsequent carrier would bill INEOS separately. Importantly, East St. Louis and New Orleans are destinations under the BNSF Rule 11 Matrix.

INEOS, BNSF, *and* Norfolk Southern Railway Corp. entered into TSA 2. TSA 2 contained a "Rate Matrix" listing rates for various destinations east of BNSF's rail lines. Under this matrix, BNSF would carry the plastics to East St.

---

[1] INEOS argues BNSF's definition is parol evidence that may not be considered when interpreting the parties' agreements. We disagree. A party may offer extrinsic evidence regarding the definition of a specialized industry term, such as Railway Accounting Rule 11. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 & n.6 (Tex. 1995); *Forest Oil Corp. v. Eagle Rock Field Servs., LP*, 349 S.W.3d 696, 699 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

3

Louis or New Orleans, where Norfolk Southern would assume the shipments and carry them to final eastern destinations. Although there were two carriers, a single rate was provided for each route. Apparently, the parties agree that this shipping method is referred to as "joint-line rate."

As the April 30, 2009 expiration date of TSA 2 approached, INEOS requested bids from railway carriers to ship plastics to the eastern destinations listed in TSA 2. Ultimately, INEOS entered into a TSA with Union Pacific Railroad Company and Norfolk Southern[2] ("Union Pacific TSA"). In the Union Pacific TSA, INEOS agreed to ship plastics via Union Pacific to East St. Louis and New Orleans, where Norfolk Southern would assume the shipments and carry them to final eastern destinations. Although we cannot determine the exact nature of the shipping method employed under the Union Pacific TSA,[3] the method appears to be more similar to the joint-line rate used in TSA 2 and not Railway Accounting Rule 11 used in TSA 1. For purposes of this opinion, we will assume joint-line rates were used in the Union Pacific TSA.

Thereafter, TSA 2 expired but TSA 1 remained in effect. INEOS began using Union Pacific to make shipments to eastern destinations via routes with a carrier transfer in East St. Louis and New Orleans. BNSF accused INEOS of breaching TSA 1, arguing INEOS was obligated under TSA 1 to use BNSF when shipping plastics to East St. Louis and New Orleans enroute to other destinations. INEOS filed suit for declaratory relief against BNSF; BNSF counterclaimed for

---

[2] "Norfolk Southern Railway Company" is the Norfolk Southern entity which entered into the Union Pacific TSA. Neither party mentions whether this entity is different than "Norfolk Southern Railway Corp.," which entered into TSA 2. For purposes of this opinion, we will assume these names refer to the same entity.

[3] Rates have been redacted on the copy of the Union Pacific TSA included in the record.

4

breach of contract. The parties filed competing traditional motions for summary judgment relative to the breach issue. The trial court granted BNSF's motion for summary judgment and denied INEOS's motion, determining INEOS breached TSA 1. The parties stipulated to the amount of BNSF's damages and attorney's fees, and the trial court signed a final judgment, awarding BNSF $812,750.00 in damages, $54,926.00 in attorney's fees, and contingent appellate attorney's fees.

## II. SUMMARY JUDGMENT

In a single issue, INEOS contends the trial court erred by granting BNSF's motion for summary judgment and denying INEOS's motion.

### A. Standards of review and contract construction

A party moving for traditional summary judgment must establish there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). If the movant establishes a right to summary judgment, the burden shifts to the non-movant to present evidence raising a material fact issue. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

We review a summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). In reviewing the trial court's rulings on cross-motions for summary judgment, we must consider all summary-judgment evidence, determine all issues presented, and render the judgment the trial court should have rendered. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). We may consider evidence presented by both parties in determining the merits of either motion. *Expro Americas, LLC v. Sanguine Gas*

5

*Exploration, LLC*, 351 S.W.3d 915, 919 (Tex. App.—Houston [14th Dist.] 2011, pet. filed).

In construing a contract, we must ascertain the true intentions of the parties as expressed in the writing. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We should afford common words their plain meaning unless context indicates otherwise. *Lesikar v. Moon*, 237 S.W.3d 361, 367 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). We must consider the entire writing in an effort to harmonize and give effect to all provisions so that none are rendered meaningless. *Id.*

Generally, when a contract contains a material ambiguity, granting a motion for summary judgment is improper because interpretation of the contract becomes a fact issue. *See Hewlett–Packard Co. v. Benchmark Elecs., Inc.,* 142 S.W.3d 554, 561 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). A contract is not ambiguous if it is so worded that it can be given a definite or certain legal meaning. *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 728 (Tex. 2001). Conversely, a contract is ambiguous when its meaning is uncertain and doubtful or reasonably susceptible to more than one interpretation. *White Oak Operating Co., LLC v. BLR Const. Comps., LLC*, 362 S.W.3d 725, 733 (Tex. App.—Houston [14th Dist.] 2011, no pet.). However, an ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Sturges*, 52 S.W.3d at 728. Rather, for an ambiguity to exist, both interpretations must be reasonable. *Id.*

## B. Analysis

As noted above, the Minimum Volume Requirement in TSA 1 provided: "[INEOS] agrees to ship 95% of all its rail movements of the Commodities listed herein moving between the Origins and Destinations listed herein, via routes listed

herein during each year this contract and/or amendments are in effect." BNSF alleges that INEOS breached the Minimum Volume Requirement of TSA 1 by using Union Pacific to ship plastics to East St. Louis and New Orleans, where the plastics were transferred to Norfolk Southern for shipment to eastern destinations. According to BNSF, INEOS was required to comply with TSA 1 for any routes that included East St. Louis or New Orleans as an "interchange destination."

INEOS contends TSA 1 existed simultaneously with TSA 2 for several years and, thus, TSA 1 and TSA 2 must be construed together to determine the parties' intent. In support of this contention, INEOS cites well-established precedent that documents pertaining to the same transaction may be read together as if they were part of a single, unified instrument, even if they were executed at different times and do not reference each other. *See In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010) (orig. proceeding) (per curiam).

INEOS argues a reasonable construction of TSA 1 and TSA 2 together conclusively establishes that the parties intended for TSA 1 to apply only when East St. Louis and New Orleans were final destinations. According to INEOS, during the course of the parties' relationship, TSA 2 applied whenever INEOS shipped plastics to final eastern destinations via routes with a carrier transfer in East St. Louis or New Orleans; TSA 1 simply did not apply in such situations. Therefore, INEOS contends that expiration of TSA 2 freed INEOS to contract with, and use, other carriers for shipping plastics to final eastern destinations with transfers in East St. Louis or New Orleans. INEOS also argues there was no provision in TSA 1 or TSA 2 mandating that TSA 1 would exclusively control shipments via those routes after expiration of TSA 2.

7

BNSF alleges INEOS breached a version of TSA 1 that was amended on May 28, 2009—*after* TSA 2 expired on April 30, 2009. Thus, the relevant version of TSA 1 was not effective simultaneously with TSA 2. Assuming it is appropriate for this court to construe TSA 1 with prior versions of TSA 1 and TSA 2, our record does not contain the full text of any prior version of the agreements. We are precluded from construing these agreements together to determine the parties' intent relative to application of TSA 1 after expiration of TSA 2.[4] Therefore, INEOS has not conclusively established that it is entitled to summary judgment based on a combined interpretation of TSA 1 and prior versions of TSA 1 and TSA 2. *See Barzoukas v. Found. Design, Ltd.*, 363 S.W.3d 829, 833–34, 837–38 (Tex. App.—Houston [14th Dist.] 2012, pet. filed) (concluding summary judgment was inappropriate because relevant contracts were not included in the record).

Consequently, on this record, we are confined to the contents of TSA 1 to determine whether BNSF is entitled to summary judgment.[5] As noted above, TSA 1 contained two matrices of routes: (1) the BNSF Rate Matrix, comprised of routes to destinations which were apparently intended to be final destinations; and (2) the BNSF Rule 11 Matrix, comprised of routes to destinations where a second carrier would assume the shipment and bill INEOS separately. Notably, many of the destinations listed in the BNSF Rate Matrix are also listed in the BNSF Rule 11 Matrix, including East St. Louis. However, the Minimum Volume Requirement does not specify which routes (whether those in the BNSF Rate Matrix or the BNSF

---

[4] For example, it is unknown when the original versions of TSA 1 and TSA 2 were executed or whether East St. Louis and New Orleans were always listed as destinations throughout the permutations of the agreements.

[5] BNSF contends that TSA 1 should be construed without reference to TSA 2.

8

Rule 11 Matrix) INEOS must use when shipping plastics "between the Origins and Destinations listed herein."

INEOS argues that the parties intended for the Minimum Volume Requirement in TSA 1 to apply only when INEOS shipped plastics to East St. Louis and New Orleans as *final destinations*. In support, INEOS notes that the Minimum Volume Requirement applied to plastics "moving between the Origins and *Destinations*." (emphasis added). Applying the common meaning, INEOS argues "Destinations" clearly referred to "the place for which a person or thing is destined; the intended end of a journey or course." *Fountain Place Cinema 8, LLC v. Morris*, 707 S.E.2d 859, 864 (W. Va. 2011) (quoting common meaning of "destination"). However, contract terms are given their plain, ordinary, and generally accepted meanings *unless* the contract itself shows them to be used in a technical or different sense. *Forest Oil Corp.*, 349 S.W.3d at 699. In the BNSF Rate Matrix, "Destination" apparently referred to locations where the shipment would be delivered; in the BNSF Rule 11 Matrix, "Destination" referred to locations where a second carrier would assume the shipment and carry it to another location. Thus, the term "Destinations" could have referred to either final destinations or interchange destinations. The parties must have intended that the destination of a shipment (i.e., whether it is a final destination or an interchange destination) would be determinative of which matrix to apply.

With this understanding, we conclude one reasonable interpretation of the Minimum Volume Requirement is that the parties intended for INEOS to use routes and rates listed in BNSF Rule 11 Matrix for shipments requiring a carrier transfer in East St. Louis and New Orleans pursuant to Railway Accounting Rule 11 *or any other shipping method*. In other words, whenever INEOS shipped plastics to East

9

St. Louis or New Orleans as an interchange destination, the Minimum Volume Requirement applied. Under this interpretation, INEOS breached the Minimum Volume Requirement by using Union Pacific to carry more than 5% of INEOS's joint-line rate shipments to East St. Louis and New Orleans where Norfolk Southern assumed the plastics and carried them to eastern destinations, *even though the routes listed in the Union Pacific TSA were not governed by Railway Accounting Rule 11*.

However, construing the same language, we also conclude the parties may have intended the Minimum Volume Requirement to apply to INEOS's shipments of plastics that required a carrier transfer in East St. Louis and New Orleans pursuant to *only Railway Accounting Rule 11*. In other words, INEOS was required to comply with the Minimum Volume Requirement for shipments to East St. Louis or New Orleans as an interchange destination only when Railway Accounting Rule 11 applied. This interpretation is reasonable because Railway Accounting Rule 11 is the only multi-carrier shipping method used in the BNSF Rule 11 Matrix. Under this interpretation, INEOS *did not* breach the Minimum Volume Requirement by using Union Pacific to carry more than 5% of INEOS's joint-line rate shipments of plastics to East St. Louis and New Orleans where Norfolk Southern assumed the plastics and carried them to eastern destinations *because the routes listed in the Union Pacific TSA were not governed by Railway Accounting Rule 11*.

Accordingly, TSA 1 is subject to at least two reasonable interpretations: one establishes BNSF's breach-of-contract claim, and the other negates the claim. We hold the trial court erred by granting BNSF's motion for summary judgment but did not err by denying INEOS's motion. INEOS's sole issue is sustained in part and overruled in part.

10

We reverse the trial court's judgment and remand for further proceedings consistent with this opinion.[6]

/s/    Charles W. Seymore
Justice

Panel consists of Chief Justice Hedges and Justices Seymore and Brown.

---

[6] Our interpretation of TSA 1 is based solely on a review of TSA 1, not a construction of TSA 1 coupled with the former versions of TSA 1 and TSA 2. Our opinion does not prevent the parties from contending on remand that their agreement was unambiguous when TSA 1 and the former TSAs are considered together. We do not address whether a joint construction of the agreements is appropriate in this context.