# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00720-CV

**SideCars, Inc., Appellant**

**v.**

**The Texas Department of Insurance; Mike Geeslin, Commissioner of Texas Department of Insurance; Collateral Protection Insurance Agency, Inc.; and HUB International Financial, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. D-1-GN-10-000976, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The issues presented in this appeal concern the legality of appellant SideCars, Inc.'s "Collateral Protection Coverage" (CPC) program that it marketed, sold, and administered for "buy here, pay here" car dealers.[1]  Facing competing motions for summary judgment, the trial court ruled in favor of appellees the Texas Department of Insurance and Mike Geeslin, in his capacity as the Texas Commissioner of Insurance, Collateral Protection Insurance Agency, Inc. (CPIA), and HUB International Financial.  The court concluded that the CPC program constituted the unauthorized business of insurance and permanently enjoined SideCars from marketing, offering for sale, or

---

[1]  The "buy here, pay here" dealers typically sell and finance used cars to low-income individuals unable to obtain financing from traditional sources.  Because the customers "buy" the car at the dealership and "pay" on their loan there, this type of dealer has become known as a "buy here, pay here" dealer.

selling the CPC program. *See* Tex. Ins. Code §§ 101.101-.105. On appeal, SideCars challenges the injunctive relief and summary judgment rulings in favor of the State and CPIA.[2] For the reasons that follow, we affirm the trial court's judgment.

## BACKGROUND

*The CPC Program*

The documents and undisputed facts show that SideCars marketed, sold, and then administered the CPC program for "buy here, pay here" car dealers. The car dealers offered the program to buyers at the inception of a retail installment motor vehicle transaction. Under the program, the car dealer provided the buyer with written notice that the buyer was required to obtain physical damage insurance naming the dealer as loss payee or, alternatively, to make periodic payments to the car dealer under the CPC program.[3] The notice, entitled "Physical Damage Insurance Requirement Notice," included terms and conditions of the program. The buyer was notified:

> CREDITOR is only Covered. Our CPC contract provides single interest coverage and does not directly protect your interest in the same way as your own insurance would. Benefit payments made under our CPC contract will be made to CREDITOR and will be credited to your loan balance or used to repair your vehicle at CREDITOR's discretion. In the event of a covered loss, our CPC contract will pay the lesser of (1) the cost to repair or replace your auto, (2) the actual cash value of your auto or (3) the Outstanding Net Balance of your loan on the date of loss . . . . Also, a deductible (as shown below) applies to each loss.

---

[2] On appeal, SideCars does not challenge the trial court's rulings in favor of HUB International Financial, and HUB International Financial has not participated in the appeal.

[3] In the notice, "CPC" stands for "Creditor Placed Coverage."

. . . .

> The rates for this coverage are not fixed or approved by the state board of insurance and does not provide you any protection, . . . and furthermore such insurance protects only the creditor and does not protect your equity in the vehicle described below.

The buyer then initialed either that the buyer had obtained the required insurance or that the buyer "[had] not obtained required insurance on [his or her] own." In the latter case, the buyer requested the car dealer to insure its own interest under the CPC program:

> I request CREDITOR to insure its own interest in my vehicle under their single interest CPC contract and that I will be responsible to pay the cost to CREDITOR of such coverage as documented below. I understand that I may purchase my own required insurance at any time and coverage under the CPC contract will be cancelled. **I understand that this limited physical damage coverage does not include liability coverage and that I have or will obtain liability insurance from an agency or company of my choice.**

The notice then set out the cost to the buyer of the program including the deductible that would apply in the event of a covered loss and the payment schedule. The notice also stated that the buyer "agree[d] that any refund of unearned premium shall be refunded to [buyer]."

Under the program, a participating car dealer would forward the fee paid by its buyers for the cost of the program to SideCars who administered the program for the car dealer. SideCars retained a portion of the fee for its administrative charge. A portion of the fee was used to purchase stop-loss coverage,[4] and the remainder of the fee was placed in a bank account of a Producer Owned

---

[4] "Stop-loss coverage is an insurance product that allows self-funded plans to minimize the chances of catastrophic loss by shifting some of the risk onto an insurance carrier." *American Nat'l Ins. Co. v. Texas Dep't of Ins.*, 364 S.W.3d 299, 301 (Tex. App.—Austin 2010), *rev'd on other grounds*, __ S.W.3d __, No. 10-0374, 2012 WL 1759457, at *5–6 (Tex. May 18, 2012).

3

Reinsurance Company (PORC) wholly owned by the car dealer.[5] SideCars then administered the bank account for the PORC, including paying covered claims under the CPC program from the PORC's bank account.

*Litigation Commenced*

SideCars filed this suit in March 2010 against the Department and the Commissioner. SideCars sought declarations and injunctive relief concerning the legality of the CPC program. SideCars also brought claims against two of its competitors, appellees CPIA and HUB International Financial. The Department, the Commissioner, and the State of Texas (collectively, the State), acting through the Office of the Attorney General, counterclaimed with an enforcement action seeking to enjoin SideCars from engaging in the unauthorized business of insurance and for civil penalties pursuant to the Insurance Code. *See* Tex. Ins. Code §§ 101.101–.105. It was undisputed that SideCars did not hold a certificate of authority or license to engage in the business of insurance in Texas.

The State and SideCars jointly made evidentiary stipulations and filed cross motions for summary judgment based upon the stipulations. They stipulated to the authenticity and admissibility of documents that form the CPC program and joined issue on whether the program constituted the unauthorized business of insurance. CPIA and HUB International Financial also filed summary judgment motions against SideCars. After a hearing, the trial court denied SideCars' motion and granted the State's motion for partial summary judgment and the motions of CPIA and

---

[5] According to SideCars, it assisted the car dealers in setting up their PORC.

4

HUB International Financial. The trial court rendered partial summary judgment permanently enjoining SideCars from marketing, offering for sale, or selling its CPC program and from engaging in the unauthorized business of insurance. The summary judgment rulings and permanent injunction were severed and made final and are the subject of this appeal.

## ANALYSIS

SideCars raises three issues on appeal challenging the trial court's rulings granting summary judgment in favor of the State and CPIA and denying its competing motion for summary judgment. In its first issue, SideCars contends that its "collateral protection insurance program" meets all the requirements of section 307.051 of the finance code and "is not an insurance product sold to car buyers." *See* Tex. Fin. Code § 307.051.[6] As such, SideCars contends in its third issue that the

---

[6] Section 307.051(a) defines collateral protection insurance as follows:

(a)　　Collateral protection insurance is insurance coverage that:

　　　(1)　　is purchased by a creditor after the date of a credit agreement;

　　　(2)　　provides monetary protection against loss of or damage to the collateral or against liability arising out of the ownership or use of the collateral; and

　　　(3)　　is purchased according to the terms of a credit agreement as a result of a debtor's failure to provide evidence of insurance or failure to obtain or maintain insurance covering the collateral, with the costs of the collateral protection insurance, including interest and any other charges incurred by the creditor in connection with the placement of collateral protection insurance, payable by a debtor.

Tex. Fin. Code § 307.051(a). The term includes insurance coverage that protects "only the interest of the creditor" or "both the interest of the creditor and some or all of the interest of a debtor." *Id*.

agency charged with the regulation of its program is the Office of Consumer Credit Commissioner (OCCC) and not the Department.[7]  In its second issue, SideCars contends that car dealers under the CPC program insure their own collateral risk under section 101.053(b)(6) of the Insurance Code and, in so doing, cover their collateral risk with an authorized insurer as required by section 307.056 of the Finance Code.  *See id*. § 307.056; Tex. Ins. Code § 101.053(b)(6).

As to CPIA, SideCars argues that, if this Court reverses the summary judgment rulings in favor of the State, it also must reverse the trial court's rulings as to CPIA.[8]

***Standard of Review***

We review a trial court's summary judgment rulings de novo.  *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).  To prevail on a traditional motion for summary judgment, the movant must show that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  Tex. R. Civ. P. 166a(c).  When reviewing a summary judgment, we must take evidence favorable to the nonmovant as true, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts in the nonmovant's favor.  *Dorsett*, 164 S.W.3d at 661. When the parties move for competing summary judgment on the same issues and the trial court grants one motion and denies the other, as is the case here, we consider the summary judgment evidence

---

§ 307.051(b).

[7] We deny SideCars' motion to strike the OCCC's amicus curiae brief that was received by this Court.  *See* Tex. R. App. P. 11.

[8] CPIA urges, among its arguments, that SideCars waived any argument as to the trial court's rulings in favor of CPIA.  Because we affirm the trial court's judgment in favor of the State, we need not address CPIA's additional arguments.  *See* Tex. R. App. P. 47.1.

presented by both sides, determine all questions presented, and if we determine that the trial court erred, render the judgment the trial court should have rendered. *Id.*

SideCars' issues primarily concern matters of statutory construction which we also review de novo. *See Texas Mun. Power Agency v. Public Util. Comm'n*, 253 S.W.3d 184, 192 (Tex. 2007). Of primary concern is the express statutory language. *See Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). We apply the plain meaning of the text unless a different meaning is supplied by legislative definition or is apparent from the context or the plain meaning leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008). We consider the entire act, not isolated portions. *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011); *20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008).

### *Regulation of Collateral Protection Insurance*

We begin with SideCars' third issue addressing whether "collateral protection insurance" is subject to regulation by the Department. SideCars does not dispute that collateral protection insurance is a type of insurance.[9] *See* Tex. Ins. Code § 101.051(b) (listing acts that "constitute the business of insurance in this state"); *In re Texas Ass'n of Sch. Bds., Inc.*, 169 S.W.3d 653, 658–59 (Tex. 2005) (definition of insurance discussed). But SideCars contends that

---

[9] SideCars also does not dispute that the CPC program is a form of insurance. In its brief to this Court, it states that the program is a "self-funded collateral protection insurance product." In its reply brief, it states that "no one is arguing whether 'insurance' exists . . . . This case is about who is covered." Further, the program's notice to the buyer at the inception of the retail installment transaction uses the terms "insurance" and "premium" to describe the program, although the notice also uses the terms "fee" and "CPC contract."

7

this type of insurance is not regulated by the Department but solely by the OCCC pursuant to chapter 307 of the Finance Code. *See* Tex. Fin. Code §§ 307.001–.058. Section 14.108 of the Finance Code provides that the OCCC has interpretative authority over chapter 307. *See id.* § 14.108. The OCCC also has regulatory authority over certain aspects of insurance products offered in connection with motor vehicle retail installment transactions. *See id.* §§ 348.201–.215.

The State contends, among its arguments, even if the CPC program is collateral protection insurance as that term is defined in the Finance Code and subject to regulation by OCCC, it also is subject to regulation by the Department. We agree. Section 31.002 of the Insurance Code states that the Department "shall . . . regulate the business of insurance in this state" and "ensure that this code and other laws regarding insurance and insurance companies are executed." Tex. Ins. Code § 31.002(1), (3). Section 31.021 similarly states that "[t]he commissioner shall administer and enforce this code, other insurance laws of this state, and other laws granting jurisdiction or applicable to the department or the commissioner." *Id*. § 31.021(a). These provisions authorize the Department to administer and enforce the Insurance Code as well as "other insurance laws of this state." *Id*. § 31.021(b)(1). Based upon the plain language of these sections, the provisions in chapter 307 of the Finance Code addressing insurance are within the Department's regulatory authority.

Further, the legislature in the Insurance Code authorizes the Department to regulate "any form of motor vehicle insurance." *Id*. art. 5.01. Article 5.01(b) states: "The Board shall have the sole and exclusive power and authority, and it shall be its duty to determine, fix, prescribe, and promulgate just, reasonable and adequate rates of premiums to be charged and collected by all insurers writing any form of insurance on motor vehicles in this State." *Id*. art. 5.01(b). "Motor

8

vehicle or automobile insurance as referred to in this subchapter shall be taken and construed to mean every form of insurance on any automobile . . . ." *Id*. art. 5.01(e). Collateral protection insurance on an automobile falls within the plain meaning of the phrase "every form of insurance on any automobile." *See id.*

The legislature also describes acts that constitute the business of insurance in section 101.051(b), and excepts activities in section 101.053. *Id.* §§ 101.051, .053. Section 101.053 expressly excepts such activities as "the lawful transaction of surplus lines insurance under Chapter 981 [of the Insurance Code]" and the "lawful transaction of reinsurance by insurers."[10] *Id.* § 101.053(b)(1), (2). The legislature, however, did not include the transaction of collateral protection insurance in the enumerated excepted activities. Had the legislature intended to except this type of insurance transaction from conduct that constitutes the business of insurance, it could have easily said so. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981) ("It is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose . . . [and] we believe every word excluded from a statute must also be presumed to have been excluded for a purpose.").

Provisions in the Finance Code, including those in chapter 307, consistently show that the legislature intended for the Department to regulate collateral protection insurance. For example, section 307.056, titled "Choice of Carrier," states:

---

[10] SideCars does not contend that the CPC program is surplus lines insurance or reinsurance.

> Collateral protection insurance may be placed with an insurer that is authorized to write insurance in this state or an eligible surplus line insurer selected by the creditor. The insurance shall be evidenced by an individual policy or a certificate of insurance.

Tex. Fin. Code § 307.056. By requiring "collateral protection insurance to be placed with an insurer that is authorized to write insurance in this state or an eligible surplus line insurer," the plain language of this section acknowledges and confirms the Department's regulatory authority over collateral protection insurance. *See* Tex. Ins. Code §§ 801.051 (certificate of authority); 981.001–.222 (surplus lines insurance).

Sections 307.055 and 307.058 likewise recognize the Department's regulatory authority over collateral protection insurance. *See* Tex. Fin. Code §§ 307.055, .058. Addressing the refund of unearned premiums, section 307.055 references the Department's automobile rules and rating manual for collateral:

> On the date the collateral protection insurance is canceled or expires, the amount of unearned premiums, as computed by the Texas Automobile Rules and Rating Manual for collateral to which that manual applies and pro rata for all other types of collateral, shall be refunded to the creditor.

*Id.* § 307.055(a). SideCars argues that, under the CPC program, the amount of unearned premiums was computed pro rata, but section 307.055(a) expressly limits the computation of unearned premiums pro rata for "types of collateral" that are not subject to the Department's manual, such as real property. Section 307.058 also provides that chapter 307 "does not impair or alter other requirements of this code or other law that may apply to a credit transaction." *Id.* § 307.058. This

10

section makes clear that the legislature did not intend to affect the requirements of other applicable laws—such as the Insurance Code—to a credit transaction subject to chapter 307 of the Finance Code.

Although not in chapter 307, section 348.207(b) provides further support that the legislature intended for the Department to regulate collateral protection insurance. *See id*. § 348.207(b). This section addresses the situation in which a retail buyer fails to obtain or maintain coverage that is required by a retail installment contract. It expressly provides that "substitute insurance . . . must be written at lawful rates in accordance with the Insurance Code by a company authorized to do business in this state." *Id*. Subchapter C of chapter 348 allows a holder of a retail installment transaction to request or require the buyer to purchase different types of insurance, including property insurance, credit life insurance, and credit health and accident insurance. *See id*. §§ 348.201–.202.

Viewing chapter 307 of the Finance Code in its entirety and in context with other provisions of the Finance and Insurance Codes, we conclude that collateral protection insurance is subject to regulation by the Department as a matter of law. *See Parker*, 249 S.W.3d at 396; *Hughes*, 246 S.W.3d at 625–26. We overrule SideCars' third issue.

### *Applicability of Section 101.053(b)(6)*

In its second issue, SideCars contends that the CPC program is excepted under section 101.053(b)(6) of the Insurance Code, and that, as such, the car dealers cover their collateral risk with an authorized insurer as required by section 307.056 of the Finance Code. *See* Tex. Fin. Code § 307.056; Tex. Ins. Code § 101.053(b)(6). As previously stated, section 307.056 provides in part that "[c]ollateral protection insurance may be placed with an insurer that is authorized to write

11

insurance in this state." Section 101.053(b)(6) of the Insurance Code provides that section 101.051—the section defining conduct that constitutes the business of insurance—does not apply to "an activity in this state by or on the sole behalf of a nonadmitted captive insurance company that insures solely . . . the risks of the company's parent or affiliated companies." SideCars contends that it was administering the car dealers' "self-funded collateral protection insurance" on the "sole behalf" of the car dealers' "non-admitted captive insurance compan[ies]" and that this arrangement was authorized by section 307.056 of the Finance Code. To support its position that its program was self-funded, SideCars characterizes the payments by car buyers under the CPC program as reimbursements to the car dealers and the only promise made by the car dealers in exchange for the reimbursements to be "if [a buyer] fails to buy 'their own insurance' that the creditor will not default them on the finance contract if they cover the cost of the dealer's collateral protection coverage."

Even if we assume that the SideCars' dealers were properly utilizing nonadmitted captive insurance companies under the CPC program, however, the summary judgment evidence shows that section 101.053(b)(6) would not apply as a matter of law. *See* Tex. R. Civ. P. 166a(c). The plain language of subsection (b)(6) requires that the activity insure "solely" the risks of the affiliated company. Although SideCars argues that the CPC program only insured the risks of the car dealers,[11] the plain language of the written notice provided to the car buyers contradicts this position.

_____

[11] SideCars argues, for example, that the dealers did not have to submit a claim under the CPC program in the event of a covered loss and that the buyer had no recourse in that event. In its reply brief, SideCars describes its dealers' options in the event of a covered loss as follows:

Under the CPC program the buyer continues to assume the financial risk associated with the damage to or destruction of his financed automobile . . . . A creditor could finance a car, receive payments over the course of the loan, and prior to the loan

12

*See Dynegy Midstream Servs. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) (courts give contract terms plain meaning).

Regardless of how the buyers' payments under the CPC program are characterized, the notice set out the car buyers' agreement to fund the CPC program by paying periodic fees—described in the notice and even by SideCars at times as "premiums"—to the dealers during the course of the financing transaction.[12] The buyer also was responsible for a deductible in the event of a covered loss. In exchange, the notice stated that, in the event of a covered loss, the CPC program "will pay the lesser of (1) the cost to repair or replace [the buyer's] auto, (2) the actual cash value of [the buyer's] auto, or (3) the Outstanding Net Balance of [the buyer's] loan on the date of loss." Based upon the plain language of these provisions, the CPC program did not insure "solely" the risks of the car dealers. *See, e.g., In re Texas Ass'n of Sch. Bds., Inc.*, 169 S.W.3d at 658–59 (discussing definition of insurance).

The fact that the CPC program purported to insure only the car dealers is not dispositive. *See Texas Ass'n of Qualified Drivers v. State*, 361 S.W.2d 580, 581–82 (Tex. Civ. App.—Austin 1962, no writ) (citation omitted) ("Whether or not a contract is one of insurance is to be determined by its purpose, effect, contents, and import, and not necessarily by the terminology used, and even though it contains declarations to the contrary."); *Ware v. Heath*, 237 S.W.2d 362, 363

---

payoff, the car could be damaged. The creditor need not file a claim at all if the payoff from its self funded reserves would be greater than the amount of the loan remaining. The dealer/creditor could simply elect to not file a claim and face the consequences of the buyer going into default and stopping payment on the note.

[12] For example, SideCars states in its reply brief: "The monthly premium pays an administration fee and established a claims account."

(Tex. Civ. App.—Fort Worth 1951, no writ) (citation omitted) (insurance contract defined as "'an undertaking by one party to protect the other party from loss arising from named risks, for the consideration and upon the terms and under the conditions recited'" and not "essential that loss, damage, or expense indemnified against necessarily be paid to the contractee [and] may constitute insurance if it be for his benefit and a contract on which he, in case of a breach thereof, may assert a cause of action").

Based upon plain language of the notice provided to the car buyers under the CPC program, we conclude that section 101.053(b)(6) is inapplicable to the CPC program as a matter of law. *See Apache Corp.*, 294 S.W.3d at 168. We overrule SideCars' second issue.[13]

## CONCLUSION

We conclude that the trial court did not err in its summary judgment rulings and affirm the trial court's judgment.[14]

---

[13] Because SideCars' second and third issues are dispositive, we need not reach its first issue of whether the CPC program is "collateral protection insurance" as that term is defined in the Finance Code. *See* Tex. R. App. P. 47.1.

[14] Pending before this Court is the State's motion for leave to extend time to file attached sur-reply brief. We grant the motion for leave.

_____

                              Melissa Goodwin, Justice

Before Justices Puryear, Rose and Goodwin

Affirmed

Filed:   May 30, 2013