DYNEGY MIDSTREAM SERVICES, LIMITED PARTNERSHIP and Versado Gas Processors, LLC, Petitioners,

v.

APACHE CORPORATION, Respondent.

No. 07–0043.

Supreme Court of Texas.

Argued Sept. 9, 2008.

Decided Aug. 28, 2009.

Mike A. Hatchell, Locke Lord Bissell & Liddell, LLP, Austin, TX, John B. Hall, Christopher Benjamin Dove, Gregory F. Burch, Alfonso Antroy Arreola, Jesus Gar-cia Jr., J. Michael Dorman, Locke Lord Bissell & Liddell, LLP, S. Shawn Stephens, Baker & Hostetler, LLP, Houston, TX, for Dynegy Midstream Services.

Roger Townsend, Jennifer R. Tillison, Alexander Dubose Jones & Townsend LLP, Geoffrey L. Harrison, Kenneth E. McNeil, Susman Godfrey, L.L.P., Christopher W. Barnes, Houston, TX, Laurie Lavigna Gallun, McKool Smith PC, Austin, TX, for Apache Corporation.

David M. Gunn, Beck, Redden & Secrest, L.L.P., Houston, TX, for Amicus Curiae Gas Processors Association.

David R. Taggart, Lemle & Kelleher, L.L.P., Shreveport, LA, for Amicus Curiae Texas Pipeline Association.

Justice WILLETT delivered the opinion of the Court.

In this gas-contract dispute, Apache Corporation seeks recovery for an allegedly large volume of "unaccounted-for" gas that disappeared between production at Apache's wellheads (where title to all gas transferred to the processor) and sale to customers at the processing facility (the tailgate). We hold that Apache's claim is contrary to the governing contract language, which focuses on gas sold, not gas delivered, thus avoiding disputes over how (and how much) gas failed to reach the point of sale. When calculating the proceeds due to Apache under these "percentage of proceeds" contracts, only one criterion matters: sales. Common throughout the natural-gas industry, these contracts unambiguously base payment on the amount of gas ultimately sold at the tailgate (not the amount initially delivered at the wellhead), and Apache admits it was paid in full for "every molecule of gas" sold at the tailgate of the processing plants.

Our decision today, besides clarifying the contractual payment standard—one

that rewards processors for minimizing leakage and maximizing the amount of gas actually sold—also addresses other claims. In sum, we affirm the court of appeals' judgment in part and reverse it in part, and remand to the trial court to render a judgment in conformity with this opinion.

## I. Background

Though technical in nature, and part of a voluminous record, the relevant facts are neither complicated nor disputed. Apache owns gas wells in Texas and New Mexico. Apache and Versado Gas Processors, LLC are parties to eighteen gas-purchase contracts in issue. Under these contracts, gas is transported from Apache's wellheads through Versado's gathering system (pipelines and compressor stations) to Versado's three processing plants:[1] the Eunice, Monument, and Saunders plants. While en route some hydrocarbon liquids, known as field condensate, precipitate out of the gas and are removed by Versado. The processing plants employ compression, refrigeration, and other processes to remove water and other contaminants and to produce gas liquids. The end products are marketable hydrocarbon liquids and "dry gas," also known as "residue gas." Versado sells these products to third parties. The volume of residue gas sold is metered at the plant tailgate and then sent to purchasers via sales lines.

Versado and amici curiae[2] categorize the gas-purchase contracts as "percentage of proceeds" contracts. The contracts are not identical, but all of them expressly provide that Versado is obliged to pay Apache a percentage of the "net proceeds" generated from the sale of "residue gas." Residue gas is not defined in three of the contracts. In all the others the term is defined as gas that has arrived at the processing plants or gas that is otherwise available for sale to third parties.[3] The contracts also entitle Apache to compensation for the hydrocarbon liquids extracted at the plants. All the contracts provide that title to the gas transfers to Versado at or near the wellhead. Five of the contracts additionally provide that Apache conveys to Versado "free of cost" all gas that is "flared, leaked, or otherwise lost" between production at the well and sale at the processing plant tailgate.[4]

---

1. Petitioner Dynegy Midstream Services, Limited Partnership is a co-owner of Versado. Because Versado has no employees, Dynegy operated the processing plants and performed the contracts.

2. The Gas Processors Association and the Texas Pipeline Association.

3. Two of the contracts define Residue Gas as "any gas connected to Buyer's plant gas gathering system which is sold before processing or which is discharged in the form of gas from the gas processing facility."

   Five contracts define it (with some differences in capitalization) as "[g]as which is discharged in the form of gas from the Plant before or after processing or sold as fuel from Buyer's gathering system."

   Five define it as "the quantity of Gas which remains after the Liquid Hydrocarbon Products are extracted, the acid gas and any other components are removed from the Gas to make the Residue Gas merchantable and after the allocated volumes of Plant fuel, field and Plant compressor fuel, Plant and field losses, and flare are deducted. It shall also mean Gas bypassed around the Plant."

   Two define it as "the quantity of Gas remaining after the (a) extraction of Natural Gasoline and Additional Products, (b) plant fuel requirements, (c) plant and field losses, (d) field and plant compressor fuel, and (e) flare."

   One defines it as "[t]hat portion of the gas remaining after the extraction of Products and deductions for fuel, flare and loss."

4. These five contracts provide: "Seller hereby conveys to Buyer free of cost to Buyer, title to the Gas consumed as fuel in the operation of the Plant and Gathering System, and all Gas which is flared, leaked or otherwise lost in the

Gas is metered at the wellhead and at the plant tailgate. There is no dispute that more gas enters the gathering system at Apache's wellheads than exits at Versado's tailgates, because (1) some gas is lost in transmission due to pipeline leaks, (2) some gas is used to fuel equipment at the plant or along the pipeline route, and (3) gas must sometimes be flared or vented during repair or other routine or emergency operations. In addition, the volume of gas exiting the tailgate is smaller than the volume at the wellhead because natural gas liquids and impurities such as water vapor are condensed from the gas stream before the residue gas at the tailgate is sold to third parties.

After Apache conducted a routine audit, it concluded that Versado could not account for large quantities of gas and that Apache was entitled to compensation for this unaccounted-for gas. Apache sued Versado for breach of contract, and the parties also sought a declaratory judgment on whether Apache was entitled to payment for condensate collected at compressor booster stations that had once been processing plants. Apache also sued for violations of the New Mexico Unfair Practices Act (NMUPA).[5]

The trial court granted summary judgment for Versado on some claims, and the remaining claims went to trial. With regard to unaccounted-for gas, Apache argued that unaccounted-for gas is a separate category apart from plant and field losses and other categories of gas specified in the contracts. Apache based its proof in part on some of Versado's own internal accounting documents, which purported to account for fueled, flared, or leaked gas, as well as other documents referencing "unaccounted-for" gas, "unaccountables," and "lost and unaccounted-for" gas. Versado contends that unaccounted-for gas simply refers to gas that was used as fuel or lost through pipeline leaks or flaring, but regardless Versado is only obliged under the contracts to pay Apache a percentage of the proceeds from the actual sales of residue gas to third parties. Since Versado indisputably complied with this obligation, it claims it is not liable to Apache as a matter of law.

The jury found that Versado failed to comply with its contractual obligation to pay Apache for unaccounted-for gas, and found damages of $1,508,674. The jury also found that Versado and Dynegy deceived Apache by engaging in an unfair or deceptive trade practice under the NMUPA, and that Apache's damages on this claim also resulted in damages of $1,508,674.

The trial court granted Versado's motion for judgment notwithstanding the verdict, and entered a judgment that Apache take nothing on its claims except the condensate claim. On this claim, the trial court rendered a declaratory judgment that Apache was entitled to its allocated share of condensate collected at the Eunice North and Eunice South booster stations, and awarded Apache $75,000 in attorney's fees.

The court of appeals reversed the trial court on the unaccounted-for gas claim, and entered a judgment for Apache of $1,508,674, consistent with the jury's ver-

operation of the Plant and Gathering System...."

**5.** N.M. Stat. §§ 57–12–1 to 57–12–24. Apache asserted other claims that are not relevant to this appeal, including claims that the defendants had engaged in sham inter-affiliate sales at artificially low prices, and had breached an obligation to market residue gas.

dict.[6] It concluded that the contracts unambiguously did not permit Versado to deduct unaccounted-for gas when calculating residue gas.[7] The court of appeals also reversed the trial court on the condensate claim, concluding that Apache was not entitled to payment for liquids condensing at the Eunice North and South booster stations.[8] The court did not reach the NMU-PA claim, viewing the damages the jury awarded Apache under that claim as duplicative of damages awarded under the contract claim for unaccounted-for gas.[9]

## II. Discussion

### A. "Unaccounted–For" Gas Claim

■ Whether a contract is ambiguous is a legal question for the court.[10] "A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation."[11] We give contract terms their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning.[12] A contract is not ambiguous simply because the parties disagree over its meaning.[13] The court construes an unambiguous contract as a matter of law.[14]

■ Many contracts involving the transportation of goods apportion the risk of loss during transport. The Uniform Commercial Code, for example, provides that parties may allocate this risk as they please by express agreement,[15] and also has provisions for allocating risk of loss in the absence of an express agreement.[16] Indeed, some of the gas contracts here make reference to Versado's obligation as buyer to pay Apache a percentage of the "net proceeds f.o.b. the Plant tailgate." Generally, the Uniform Commercial Code recognizes that when parties specify "F.O.B. the place of destination," the risk of loss during transport is on the seller.[17]

6. 214 S.W.3d 554, 561, 567.

7. *Id.* at 560.

8. *Id.* at 564, 567.

9. *See id.* at 561 ("Because we have sustained Apache's second issue [regarding the unaccounted-for gas contract claim], we need not address Apache's first issue challenging the judgment on the New Mexico Unfair Practices Act....").

10. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996).

11. *Id.*

12. *Id.*

13. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex. 1996).

14. *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex.2003).

15. Tex. Bus. & Com.Code § 2.509(d). "The Code invites any lawyer who drafts a contract for the sale of goods to include a clause that specifically allocates the risk of loss between the buyer and the seller." JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 5–1, at 332 (5th ed. 2006).

16. *See* TEX BUS. & COM.CODE §§ 2.319, .503, .504, .509, .510.

17. *See id.* §§ 2.319(a)(2), 2.509(a)(2), 2.509(c). "[W]hen the contract reads 'F.O.B. *buyer's* place of business,' both [§ 2–509(a)(2) and § 2–319(a)(2) ] make it clear that the risk does not pass to the buyer until the goods are tendered to the buyer at the place of destination." JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 5–2, at 339 (5th ed. 2006). We do not suggest that these provisions of the Uniform Commercial Code actually govern this dispute, but refer to them only to illustrate the use of the term "f.o.b." in another context. Here the issue is complicated by the fact that the buyer, Versado, owned the entire gathering system and took title to the gas at or near the wellhead under the express terms of the contracts.

Under these contracts, Versado sold gas that reached the tailgate after processing, and Apache received a percentage of the net proceeds derived from the sale of that gas. Both parties suffered from losses occurring during the transportation of gas from the wellhead to the plant tailgate. The contracts did not expressly require Versado to meet specified efficiency targets with respect to leakage, flaring, or Versado's use of gas as fuel. Nor did the contracts require Versado to pay Apache for losses that exceeded specified thresholds or losses that could not be categorized.

The parties were free to apportion the risk of pipeline losses or other losses as they wished. Here, the contracts unambiguously provided that title to the gas was conveyed to Versado at the wellhead and Apache's payment for the gas it sold Versado was limited to a percentage of the proceeds from actual sales of residue gas at the tailgate.[18] Apache points to no proof that Versado intentionally converted gas and sold it to third parties without accounting to Apache for such sales,[19] or evidence that Versado committed an accounting error or mathematical miscalculation. There was no evidence at trial that Versado ever sold unaccounted-for gas, or that Versado failed to pay Apache its share of the proceeds received from any sales of residue gas. An Apache audit manager conceded at trial that "there is no evidence

to support that anything happened to this gas, the gas that you're describing as unaccounted for except that it was either flared or used as fuel or lost." He further agreed that "there's no evidence that any unaccounted for gas went out the tailgate" and that Apache was paid for "every molecule of gas" that "went out the tailgate." The volume of gas sold at the tailgate was measured by pay meters owned by third parties, and Apache has never challenged the meters' accuracy.

Apache sought recovery for sales that never occurred, but the agreements did not require Versado to pay Apache for gas unless it reached the tailgate and was sold to third parties. There is no provision in these contracts for "unaccounted-for gas." Nor did they impose liability on Versado for gas that was lost and indisputably unavailable for sale at the tailgate, but for which Versado could not establish the precise reason for the loss. Under these contracts, Versado was not contractually liable for lost gas whenever it could not definitively explain a metering discrepancy between the wellhead and the tailgate.

■ Moreover, while the court of appeals described the gas contracts as "unambiguous as a matter of law,"[20] it then relied in part on expert testimony regarding the "standard practice in the industry" for paying sellers under gas-purchase

18. Apache argues that the risk of loss for unaccounted-for gas falls on Versado under section 2.509(c) of the Uniform Commercial Code, Tex. Bus & Com.Code § 2.509(c), which states:

In any case not within Subsection (a) or (b), the risk of loss passes to the buyer on his receipt of the goods if the seller is a merchant; otherwise the risk passes to the buyer on tender of delivery.

Assuming that the contracts are subject to the Code, see El Paso Natural Gas Co. v. Minco Oil & Gas, Inc., 8 S.W.3d 309, 313 (Tex.

1999), as noted above section 2.509(d) provides that "[t]he provisions of this section are subject to contrary agreement of the parties," and here the parties made express provision to the contrary.

19. Nor do we consider the legal consequences that would follow in tort or contract for such an intentional theft of gas by the buyer under these contracts.

20. 214 S.W.3d at 560.

agreements.[21] According to Apache's expert, industry practice requires that unaccountable gas losses not exceed two percent, a percentage exceeded in this case.[22] Experts have a proper (if confined) role in litigation, but it is not to supply parol evidence to vary or contradict the terms of unambiguous contracts.[23] The parties could have agreed that Versado would pay Apache for losses exceeding a contractually specified threshold, but as noted above, the contracts do not contain such terms. The court of appeals also mentioned Versado's internally generated documents that made reference to unaccounted-for gas.[24] This evidence might be relevant to show mathematical miscalculations or other accounting errors, but again, there was no proof that these losses were anything other than gas that leaked, was flared, or was used as fuel. This extrinsic evidence cannot alter the meaning of an unambiguous contract that based payment on one criterion only: actual sales of residue gas at the tailgate.

Because the contracts unambiguously do not impose an obligation on Versado to compensate Apache for "unaccounted-for" gas that was not sold at the plant tailgate, contract damages[25] for gas lost between the wellhead and the tailgate are not recoverable. Apache's breach-of-contract claim fails as a matter of law.

## B.  NMUPA Claim

■ Apache asserts by conditional cross-petition that if its contract claim for unaccounted-for gas fails, it can recover under the New Mexico Unfair Practices Act (NMUPA). The court of appeals did not reach this issue because it held for Apache on its contract claim. Having rejected the contract claim, we address the NMUPA claim.

The jury charge included questions covering the NMUPA claim. Specifically, the jury was asked whether the defendants deceived Apache by an unfair or deceptive trade practice, whether the deception was

**21.**  *Id.* at 561.

**22.**  Apache also presented evidence that Versado's own goal was to limit gas losses to two percent.

**23.**  *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995) ("Only where a contract is first determined to be ambiguous may the courts ... admit extraneous evidence to determine the true meaning of the instrument."); *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983) ("If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law."); *Miller v. Gray,* 136 Tex. 196, 149 S.W.2d 582, 583 (1941) ("[E]vidence of custom is admissible only to explain an ambiguous contract or to add to it an element not in contravention of its terms; but such evidence is never admissible to contradict the plain unambiguous covenants and agreements expressed in the contract itself.")

**24.**  214 S.W.3d at 561. As noted above, several of these exhibits made reference to "unaccounted-for" gas, "unaccountables," and "lost and unaccounted-for" gas. For example, several exhibits plotted, by month, "unaccountables" as a percentage of production at the wellhead.

**25.**  We note that Apache did not pursue at trial a common-law tort recovery for these losses, although it alleged a negligence cause of action against Dynegy. We do not consider whether a negligence or other tort theory would be valid on these facts. The unaccounted-for gas claim was tried as a contract claim against Versado. As to liability, the jury was asked whether Versado failed "to comply with each of the Contracts by failing to pay Apache for unaccounted-for gas," and as to damages, the jury was asked to assess contract damages equal to the difference "between the amount Apache was entitled to be paid for unaccounted-for gas under the Contracts, and the amount that was actually paid by Versado for unaccounted-for gas."

willful, and whether Apache suffered damages proximately caused by defendants' deception. The jury answered "yes" to these questions and found damages of $1,508,674, the same damages it found on the contract claim for unaccounted-for gas.

The New Mexico Act covers unfair or deceptive trade practices defined to include "a false or misleading ... representation of any kind knowingly made in connection with the sale ... of goods or services ... by a person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person...."[26] Apache's theory of liability under the NMUPA is that Versado sent it inaccurate settlement statements for gas sold at the plant tailgates, more specifically, that the statements failed to provide sufficient information regarding unaccounted-for gas.[27] However, Versado had no obligation to pay Apache for gas that leaked, was flared, or was used to

fuel equipment. Assuming that New Mexico law applies,[28] and assuming that Versado and Dynegy made misrepresentations falling under the NMUPA,[29] there was no evidence that these misrepresentations caused damages to Apache.

Recovery of actual damages under the NMUPA requires proof of actual causation—a cause "which contributes to the loss and without which the loss would not have occurred."[30] The alleged misrepresentations and nondisclosures all relate to Versado's alleged failure to pay for unaccounted-for gas, but as explained above, Versado had no obligation to pay Apache for unaccounted-for gas that was never sold. Versado was only obligated to pay Apache for actual sales of residue gas, and there was no evidence that Versado failed to pay Apache its contractually mandated percentage of such sales. Indeed, Apache admits it was paid for "every molecule of gas" actually sold.[31]

**26.** N.M. Stat. § 57–12–2(D).

**27.** For example, Apache's opening brief as cross-petitioner contends that the settlement statements "lacked enough information to determine how much gas was unaccounted for" and "were so misleading that Apache could not determine that any gas was unaccounted-for;" that "even Dynegy's own measurement consultant was unable to calculate the amount of unaccounted-for gas from one of its own settlement statements;" that Versado's and Dynegy's "failure to disclose the amounts being used as fuel, being flared, and being leaked prevented Apache from realizing that the defendants were not paying for huge amounts of this unaccounted-for gas;" and that their "statements tended to deceive Apache by hiding the vast amounts of unaccounted-for gas."

**28.** Apache claims that New Mexico law applies because the processing plants are in New Mexico.

**29.** *But see Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.,* 137 N.M. 524,

113 P.3d 347, 352–53 (N.M.Ct.App.2005) (holding that seller of goods or services cannot sue under the NMUPA).

**30.** The New Mexico Supreme Court has promulgated uniform civil jury instructions. As Apache points out, and as reflected in the jury charge, Uniform Jury Instruction 13–1709 provides: "A cause of a loss is a factor which contributes to the loss and without which the loss would not have occurred. It need not be the only cause." The Committee Commentary to this Rule states that it applies to the Unfair Practices Act. *See also* N.M. Stat. § 57–12–10(B) (setting out NMUPA cause of action and providing for recovery of "actual damages" to "[a]ny person who suffers any loss of money or property ... as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act").

**31.** Apache did not establish that better accounting by Versado would have resulted in additional sales of gas, on which payment obligations to Apache would have accrued under the contracts.

### C. Condensate Claim

■ As described above, the gathering system includes numerous compressor stations. These stations help move gas from the wells to the processing plants. Liquid field condensate drops out of the gas stream because of changes in pressure and temperature, and must be removed from the gathering system to prevent blockage.

In 2000, Versado modernized its gathering system to make it more efficient, by consolidating its three Eunice plants into a single processing plant. The North and South Eunice plants were converted to compressor stations, two of about a dozen compressor stations along the gathering system that helped move gas to the three remaining processing plants. After the conversion, the gas at the North and South Eunice compressor stations proceeded to the Middle Eunice plant for processing. The Versado gathering system retained two other processing plants, the Monument and Saunders plants. Versado pays Apache for condensate produced at the three plants.

Because field condensate removed from the North and South Eunice stations had for some period been trucked and commingled with condensate produced at the Middle Eunice processing plant, Versado paid Apache for all the commingled condensate.[32] Versado sought a declaratory judgment that it "does not have an obligation to pay Apache for field condensate, including condensate that falls out in field compressor stations that used to be gas processing plants." The parties tried this issue to the court, which rendered a declaratory judgment holding that, as to the eleven contracts in issue, Versado must pay Apache its allocated share of all field condensate collected at the North and South Eunice stations. The court of appeals disagreed, reasoning that under the contracts' plain language, Versado had no such obligation.[33] Reading each contract as a whole and harmonizing the various relevant provisions,[34] we agree with the court of appeals. The only plausible construction of the contracts is that Versado is not required to compensate Apache for liquids that fall out of the gas stream at the North and South Eunice compressor stations.

According to trial testimony, liquids that condense at compressor stations are not marketable without further processing at a plant because they contain impurities such as water, hydrogen sulfide, and carbon dioxide. Some of the contracts in issue do not define "plant," but six of them define the term as a facility where gas is processed.[35] Unlike plants, the compressor stations do not treat the liquids; the liquids merely collect at the station. Plants

**32.** Versado pursued at trial a counterclaim for unjust enrichment, seeking recovery of prior payments Versado had made to Apache for condensate recovered from the North and South Eunice compressor stations, but the jury rejected this claim for a refund. The court of appeals likewise rejected this claim, reasoning, under the "voluntary-payment rule," that Apache did not wrongfully retain money from Versado because Versado had voluntarily made the payments. 214 S.W.3d at 564–65 (citing *BMG Direct Mktg., Inc. v. Peake,* 178 S.W.3d 763, 768 (Tex.2005)).

**33.** 214 S.W.3d at 564.

**34.** *See Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983) ("[T]o ascertain the true intentions of the parties as expressed in the instrument ... courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.") (emphasis omitted).

**35.** Five of the contracts define "Plant" as "the facilities used by Buyer to process gas." One contract defines "Plant" as "Gas processing facilities in which Gas is processed."

employ several stages or processes that include refrigeration or huge compressors to deliberately make liquids. The compressor stations are necessary to move gas to a plant, where the gas and liquids can be treated and sold to third parties. Compression at the plant is achieved through multi-stage compression and at higher pressure than compression at the North and South Eunice stations.

The contracts cannot be read to require Versado to compensate Apache for liquids that condense at the two compressor stations. First, all the contracts provide that title to the gas transfers to Versado at or near the Apache wellheads. Therefore, absent some more specific provision to the contrary, Versado owns any liquids that condense from the gas stream downstream of the wellheads, at the compressor stations or anywhere else.

Second, all of the contracts in issue provide that Versado is only obliged to pay Apache for liquids "saved and sold" at the "plant" or, in one contract, to pay Apache for "Products" defined as liquids "extracted through Plant processing." As explained above, the compressor stations are not plants. Further, gas liquids were not "saved and sold" at the compressor stations.

Third, ten of the eleven contracts expressly provide that any liquids exiting the gas stream en route to the final processing plants belong to Versado.[36] These provisions, requiring Versado to keep the gathering system reasonably clear of obstructions, are consistent with trial evidence that liquids leaving the gas stream prior to reaching the final processing plant are, to some extent, a nuisance because they can obstruct gas flow or unduly raise pressure. These provisions are also consistent with the provisions that Versado takes title to all the gas at the wellhead, and the provisions that Versado is only compelled to pay Apache for liquids produced at the processing plants at the other end of Versado's gathering systems. Of the six contracts that define "Plant," they all define it as facilities where the gas is processed, as opposed to the gathering system, separately defined in all these contracts as the pipelines and equipment used to deliver gas to the plant.[37] None of these contracts specify that condensate precipitating at compressor stations is treated differently from condensate precipitating at any other point in the gathering system.

Apache emphasizes that the North and South Eunice compressor stations used to be processing plants, but this fact does not alter our construction of the contracts. Other plants were converted to compressor stations, and Apache does not argue that they too must be treated as plants. Nor does Apache argue it should be paid for field condensate produced at compressor stations that have always been compressor stations. The North and South Eunice stations compress the gas to the same pressure as other compressor stations. Nothing in the contracts prohibits

36. Five of the contracts provide (with minor variations in wording):

DRIP. The Buyer shall keep reasonably clear of obstruction all its pipelines through which said gas is being delivered and shall own all liquids collected in such lines.

Five of the contracts provide:

DRIP, CONDENSATE AND SCRUBBER OIL. Buyer shall keep its Gas Gathering System reasonably clear of obstruction and shall own all drip, condensate and scrubber oil collected in such Gas Gathering System prior to the first stage of compression within the Plant.

37. Five contracts define "Gas Gathering System" as "the facilities and equipment used by Buyer to gather gas." One contract defines "Gathering System" as "the lines and equipment necessary to gather Gas from the delivery point(s) and deliver it to Buyer's Plant."

the conversion of processing plants into compressor stations as part of a gathering-system upgrade that reduced emissions, increased the overall efficiency of the system, and in fact benefitted producers as well as Versado.[38]

Apache argues that the contracts expressly state that their purpose is to extract liquid hydrocarbons. For example, five of the contracts state that the gas is being sold "for the principle [sic] purpose of extracting therefrom such Liquid Hydrocarbon Products as may be extracted at the Plant." These provisions, however, are unhelpful in determining whether a compressor station is a "plant." They do not contradict the contract provisions described above that make clear Versado (1) is only obliged to pay for liquids "saved and sold" at the plant, (2) owns all the gas after it leaves the wellhead, and (3) owns any liquids that fall out of the gas in the gathering system. These contracts expressly distinguish the "Plant" from the "Gas Gathering System." Further, these contracts only oblige Versado to pay Apache for "Liquid Hydrocarbon Products," a defined term that expressly excludes "drip, condensate or scrubber oil collected prior to the first stage of compression within the Plant." Hence, unless the liquids are collected "within the Plant," as opposed to the gathering system that includes compressor stations necessary to move the gas to the processing plant, Versado is not obliged to pay Apache for the liquids.

In sum, construing each contract as a whole and examining the relevant provisions of each, we agree with the court of appeals that none of the contracts required Versado to compensate Apache for field condensate that fell out of the gas stream at the Eunice North and South compressor stations.

## III.  Conclusion

The proper payment-measuring point under the contracts is the amount of gas sold at the processor's tailgate, not the amount delivered at the producer's wellhead. That is, a "percentage of proceeds" contract measures payment solely as a percentage of proceeds from actual sales. As Apache concedes it was fully paid for all gas actually sold, it is not entitled to recover on either its contract claim for unaccounted-for gas or its New Mexico statutory claim. Also, Versado is entitled to a declaratory judgment that it owes no additional payments for condensate collected at and resulting from the operation of the Eunice North and South compressor stations. Accordingly, we affirm the court of appeals' judgment in part and reverse it in part. We remand the cause to the trial court to render a new judgment consistent with this opinion.[39]

---

38.  According to one Dynegy witness, the consolidation effort "decreased the amount of fuel consumption for the producers" and "increased the amount of ethane production for the producers and to some degree probably a couple of percent of propane."

39.  The trial court should consider whether attorney's fees should be awarded in its modified judgment, and determine the amount of such fees, if any.