**Opinion issued August 26, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00357-CV

———————————

## TALISMAN ENERGY USA INC. AND STATOIL TEXAS ONSHORE PROPERTIES, LLC, Appellants

## V.

## ENDURING RESOURCES, LLC, Appellee

On Appeal from the 61st District Court
Harris County, Texas
Trial Court Case No. 2011-36224

## MEMORANDUM OPINION

Appellants, Talisman Energy USA Inc. ("Talisman") and Statoil Texas Onshore Properties, LLC ("Statoil"), challenge the trial court's judgment entered, after a trial to the court, in favor of appellee, Enduring Resources, LLC

("Enduring"), on Talisman and Statoil's declaratory-judgment action[1] and Enduring's breach-of-contract counterclaim. In two issues, Talisman and Statoil contend that the trial court "misread" the parties' contract and erred in not entering judgment for them and not awarding their attorney's fees.[2]

We reverse and remand.

## Background

In 2010, Talisman and Statoil agreed to work together in a joint venture to acquire Enduring's Eagle Ford Shale oil and gas leases and related assets. Talisman and Statoil then entered into an Amended and Restated Purchase and Sale Agreement ("PSA") with Enduring to buy approximately 1,500 oil and gas leases for $1.26 billion. As part of the transaction, Enduring first assigned leases and assets to an entity it formed, Enduring STBU, LLC ("Enduring STBU"), as a contribution to its capital, in exchange for "membership interests." Talisman and Statoil then purchased all of the membership interests of Enduring STBU. After the purchase, Talisman and Statoil dissolved Enduring STBU and distributed its assets to themselves in equal, undivided interests.

Talisman, Statoil, and Enduring executed the PSA on December 3, 2010, and Enduring assigned its membership interests in Enduring STBU to Talisman

---

[1]    *See* TEX. CIV. PRAC. & REM. CODE § 37.001–.011 (Vernon 2008).

[2]    *See id.* § 37.009 (Vernon 2008).

and Statoil on December 8, 2010. Thus, the leases and related assets were conveyed, payment was made, and the transaction was closed on December 8, 2010.

Section 2.2 of the PSA, entitled "Assumed Obligations and Excluded Obligations," provides:

> (a)    Without limiting Purchaser's rights to indemnity under Article 11, upon consummation of the Asset Separation, Purchaser acknowledges that Seller Sub shall assume and hereby agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid or discharged) all of the Assumed Obligations.
>
> (b)    Notwithstanding anything in this Section 2.2 to the contrary, the Assumed Obligations shall not include, and none of Purchaser or Seller Sub shall assume, any Retained Seller Obligations.

In Appendix A to the PSA, the parties defined "Assumed Obligations" as:

> (i)    [A]ll obligations and liabilities of Seller (including Environmental Liabilities), known or unknown, with respect to or arising from the Assets, other than the Retained Seller Obligations, regardless of whether such obligations or liabilities arose prior to, on or after the Effective Date, including obligations and liabilities relating in any manner to the use, ownership or operation of the Assets, including obligations to (a) furnish makeup gas and/or settle Imbalances attributable to the Assets according to the terms of applicable gas sales, processing, gathering or transportation Contracts, (b) pay working interests, royalties, overriding royalties and other interest owners' revenues or proceeds attributable to sales of Hydrocarbons produced from the Assets, (c) pay the proportionate share attributable to the Assets to properly plug and abandon any and all Wells, including temporarily abandoned Wells, (d) pay the proportionate share attributable to the Assets to dismantle or decommission and remove any property and other property of whatever kind related to or associated with operations and activities conducted by whomever on the Assets, (e) pay the proportionate share

3

attributable to the Assets to abandon, clean up, restore and/or remediate the premises covered by or related to the Assets in accordance with applicable agreements and Laws, (f) pay the proportionate share attributable to the Assets to perform all obligations applicable to or imposed on the lessee, owner, or operator under the Leases and the Contracts, or as required by any Law including the payment of all Taxes for which Purchaser is responsible hereunder and (g) comply with the terms of the Area Dedication, (ii) all obligations under the Drilling Contracts and (iii) the matters set forth on Schedule 2.2(a) . . . .

Also in Appendix A to the PSA, the parties defined "Retained Seller Obligations" as:

[A]ll obligations and liabilities of Seller, known or unknown, with respect to or arising from (i) the Excluded Assets, (ii) to the extent asserted on or prior to the date occurring twelve (12) months subsequent to the Closing Date, Third Person Claims related to the use, ownership and operation of the Assets during any period of time prior to the Closing Date . . . .

Under section 11.1(a) and (b) of the PSA, Talisman and Statoil are obligated to "indemnify, defend and hold harmless [Enduring] from and against all Damages incurred, suffered by or asserted against [Enduring and] . . . caused by or arising out of or resulting from the Assumed Obligations."

The leases that Talisman and Statoil purchased in the PSA include four leases, covering a 640-acre tract in LaSalle County, which Enduring had purchased from Thomas and William Moon and their family ("the Moon leases") for $960,000 on March 5, 2010. Each of the Moon leases contained an "Assignability" provision that required Enduring to pay the Moons an undivided

4

one-half difference between the bonus consideration paid for any assignment and 150% of the bonus consideration tendered for the original lease, minus costs. This provision reads as follows:

12. Assignability

. . . .

B. In the event Lessee shall sell or assign its interest in this lease *prior to expiration of the primary term* and *prior to developing said lands* as contemplated hereunder, and the consideration received for the sale or assignment of this lease, calculated by multiplying the total dollars received for such sale, less the proportionate share of direct land and exploration costs allocable to this lease, divided by the total number of net acres covered hereby, is greater than 150% of the per acre bonus consideration paid Lessor for this lease, then *Lessee agrees to remit to Lessor an undivided one-half of the difference between 150% of bonus consideration tendered to Lessor for this lease and the amount received by Lessee for such sale*. Lessee shall promptly notify Lessor of any such occurrence and shall, within forty-five (45) days of the execution of any such conveyance of its interest hereunder, tender its check to Lessor accompanied by an accounting of the consideration and expenses used in computing the sum due Lessor hereunder.

(Emphasis added.)

Talisman and Statoil assigned an "allocated value" of $10,315,800 to the Moon leases out of the $1.26 billion they paid for the approximately 1,500 leases purchased from Enduring, making the price paid per acre for the 640-acre tract more than 150% of the per acre bonus consideration originally paid by Enduring. On November 30, 2010, Enduring provided written notice to the Moons of its ongoing negotiations with Talisman and Statoil and their anticipated transaction,

and the Moons consented to the assignment. In December 2010, after the PSA transaction had closed, the Moon family began communicating with the parties about their rights under the Assignability provision of the Moon leases. On January 28, 2011, Enduring, citing the PSA, requested indemnification from Talisman and Statoil, which they rejected. In February 2011, the Moon family members who had an interest in a two-thirds portion of the Moon leases filed suit against Enduring and Enduring STBU (the "Moon lawsuit") for breach of contract, seeking payment under the Assignability provision of the Moon leases.

Although Enduring, Talisman, and Statoil agree that the Moons were owed damages under the Assignability provision of the Moon leases, they dispute who has the obligation to pay the damages. Enduring settled the Moon lawsuit in June 2011, and, in accord with the settlement, the Moon lawsuit was dismissed. The members of the Moon family who had an interest in the remaining one-third portion of the Moon leases then demanded payment under the Assignability provision of the Moon leases, and Enduring settled these claims as well. In total, Enduring paid $3,949,191 to settle the Moon claims under the Assignability provision of the Moon leases.

Talisman and Statoil filed the instant declaratory-judgment action against Enduring, seeking a declaration "that the obligation to pay the Moons is a 'Retained Seller Obligation' under the PSA, and thus Enduring is required to

6

defend and indemnify them against the Moon Claim[s]," which are third party claims against which Enduring must hold Talisman and Statoil harmless. Enduring answered and counterclaimed for breach of contract, alleging that the obligation to pay the Moons is an Assumed Obligation under the PSA. It asserted that Talisman and Statoil had breached their obligations under the PSA by refusing to pay the Moon claims and refusing to indemnify, defend, and hold Enduring harmless. Both parties sought attorney's fees.

After a trial to the court, the trial court denied Talisman and Statoil's claim for a declaratory judgment and rendered judgment for Enduring on its breach-of-contract counterclaim. The trial court awarded Enduring actual damages of $1,974,595.99 from Talisman and $1,974,595.99 from Statoil, $149,582.44 in prejudgment interest, and post-judgment interest to be calculated at the rate of five percent. The trial court also awarded Enduring $250,000 in trial attorney's fees and $50,000 for appellate attorney's fees, should Enduring successfully defend this appeal.[3]

## Contract Interpretation

In its first issue, Talisman and Statoil argue that the trial court erred in entering judgment in favor of Enduring because it "misread" the PSA as requiring

---

[3] At trial, the parties stipulated "that a just and reasonable fee for attorney's fees incurred by either party in the case" would be $250,000 through trial and $50,000 for the cost of a "successful defense of the appeal by" Enduring.

Talisman and Statoil to reimburse Enduring for its settlement of the Moon claims. Talisman and Statoil further argue that the Moon obligation is not an Assumed Obligation under the PSA because it "did not arise from the Assets themselves, but from the profits made selling them"; instead, it was a "Retained Seller Obligation payable by Enduring because it related to use and operations occurring before the sale." Enduring argues that the Moon obligation arose *after* the PSA closing date because it was "triggered" and "came into being" and "did not arise at all" before and until the assignment of the Moon leases to Talisman and Statoil in exchange for a sum—an event that occurred on December 8, 2010 and not before that date. Enduring asserts that this makes the Moon obligation an Assumed Obligation and not a Retained Seller Obligation. Enduring further asserts that the Moon obligation falls to the "lessees" of the Moon lease, which, as of December 8, 2010, was Talisman and Statoil.

In response to Enduring's counterclaim for breach of contract, Talisman and Statoil pleaded that the PSA is ambiguous. At trial, however, Talisman and Statoil asserted that, under the PSA, it is "clear" that the Moon obligation is a Retained Seller Obligation. Talisman and Statoil also asserted that if the trial court found the contract ambiguous, extrinsic evidence shows that Enduring believed that the Moon obligation was its own, and the intention of the parties, as reflected in the PSA, was to transfer to Talisman and Statoil a "package" of leases for which they

8

would not be required to pay additional amounts over and above the $1.26 billion sales price.

On appeal, the parties seek our review of the PSA as an unambiguous contract and do not ask that we consider the extrinsic evidence offered by Talisman and Statoil at trial. We note, however, that we are not bound by the parties' assertions that the PSA is unambiguous. Even if none of the parties assert that a contract is ambiguous, a court may determine that it is ambiguous and consider parol evidence of the parties' intentions. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc*., 907 S.W.2d 517, 520 (Tex. 1995); *Sage St. Assocs. v. Northdale Constr. Co*., 863 S.W.2d 438, 445 (Tex. 1993).

The construction of an unambiguous contract is a question of law, which we review de novo. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). If we determine that the language of the contract "can be given a certain or definite legal meaning or interpretation," it is not ambiguous, and we construe it as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed" in the terms and language of the instrument. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). We consider the contract as a whole in light of the circumstances present when it was entered. *Coker*, 650 S.W.2d at 394. When discerning the contracting parties' intent, "we

must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011) (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). "We give contract terms their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." *Dynergy Midstream Servs. Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). "A contract is not ambiguous simply because the parties disagree over its meaning." *Id.* Rather, a contract is ambiguous only when "its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation," creating a fact issue on the parties' intent. *Id.* (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).

We conclude that, when read as a whole, the language of the PSA may be given a definite legal meaning and is not ambiguous. Thus, we construe it as a matter of law. *See Coker*, 650 S.W.2d at 393.

As noted above, the dispute between the parties centers on the PSA's definitions of Assumed Obligations and Retained Seller Obligations. Generally, such terms are given their plain and ordinary meaning unless the instrument demonstrates that the parties intended a different meaning. *Apache Corp.*, 294 S.W.3d at 168.

10

Within the PSA, the parties intended to allocate certain liabilities. Assumed Obligations are those taken over by Talisman and Statoil, while Retained Seller Obligations are those obligations retained by Enduring after the closing of the PSA. The PSA requires Talisman and Statoil to indemnify Enduring for Assumed Obligations, but not Retained Seller Obligations.

The PSA defines Assumed Obligations as:

> [A]ll obligations and liabilities of [Enduring] . . . known or unknown, with respect to or arising from the Assets, other than the Retained Seller Obligations, regardless of whether such obligations or liabilities arose prior to, on or after the Effective Date,[4] including obligations and liabilities relating in any manner to the use, ownership or operation of the Assets . . . .

The definition of Assumed Obligations then provides a non-exclusive list of a number of examples, which include furnishing makeup gas, paying royalties, plugging wells, dismantling or removing property, remediating premises, paying taxes, and complying with drilling and gas-gathering contracts. The PSA excludes from the Assumed Obligations any Retained Seller Obligations. Therefore, if the Moon obligation falls within the definition of Retained Seller Obligations, it cannot constitute one of Talisman and Statoil's Assumed Obligations.

The PSA defines Retained Seller Obligations as those obligations and liabilities of Enduring with respect to or arising from excluded assets and third person claims made within twelve months of closing "related to the use, ownership

---

[4]    "Effective Date" is defined as August 1, 2010.

and operation of the Assets during any period of time prior to the Closing Date." Talisman, Statoil, and Enduring agree that the Moon claims are "Third Person Claims." And they agree that the Moon claims were brought within twelve months of the date of the PSA closing on December 8, 2010. Accordingly, we must determine whether the Moon obligation was "related to the use, ownership and operation of the Assets."

The PSA itself does not assign a definition to the phrase "related to" or provide that any limited or restrictive definition of the phrase should be used in replace of its plain, ordinary and generally accepted meaning. *See Apache Corp.*, 294 S.W.3d at 168. Noting its broad meaning, the Austin Court of Appeals has recognized that, in ordinary use, the phrase "relates to" means "to have a connection with, to refer to, or to concern." *Tex. Dep't of Pub. Safety v. Abbott*, 310 S.W.3d 670, 674–75 (Tex. App.—Austin 2010, no pet.); *see also* BLACK'S LAW DICTIONARY 1288 (6th ed. 1990) (defining "relate" as "[t]o stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with"). Similarly, in *Columbia Casualty Co. v. CP National, Inc.*, we interpreted the term "related" in an insurance policy and concluded that it means "having a logical or causal connection." 175 S.W.3d 339, 348 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

We must also determine whether the Moon claims related to the Assets in the time *prior to* the PSA closing date. One of the central disputes between the parties is exactly when the obligation to pay the bonus money to the Moons ripened and was perfected. Talisman and Statoil assert that Enduring's obligation to the Moons existed as soon as Enduring purchased the Moon leases in March 2010. Enduring asserts that the obligation to the Moons did not arise until the actual day of the closing of the PSA, when the parties' transaction was concluded, and not before the obligation to pay the Moon claims had transferred to Talisman and Statoil.

Certain conditions had to be met for the Moon claims to be valid under the Moon leases. First, Enduring, as lessee, had to sell or assign its interest in the lease before the three-year primary term of the leases expired, and "prior to developing [the] . . . lands." Second, the consideration received for the sale or assignment by Enduring had to net more than 150% of what Enduring paid to the Moons when it purchased the leases in March 2010.

If Enduring had, pursuant to the Moon leases, developed the land by drilling a well, for example, during the term of the leases, or before it sold or assigned the leases, the Moons would not have been entitled to make claims under the Assignability provision of the Moon leases. Their bonus became due only when

13

Enduring assigned the leases to Talisman and Statoil without conducting operations on the land.

Further, any drilling that had taken place on the land covered by the Moon leases after the sale or assignment of the leases would be irrelevant if the drilling had taken place before Enduring assigned the leases to Talisman and Statoil for an amount netting more than 150% of the original purchase price of the Moon leases—only what occurred *before* the Moon leases were assigned to another party is relevant. Because the bonus became due to the Moons when the Moon leases were assigned for an amount greater than 150% of the original price Enduring paid for the Moon leases, the Moon claims can only relate to Enduring's ownership and operations *before* closing.

Additionally, the Moon claims were for a bonus payment based on Enduring's original contract to purchase the Moon leases and, thus, were part of the consideration that Enduring paid to acquire the Moon leases. Accordingly, the claims related to Enduring's ownership of the Moon leases and constituted a Retained Seller Obligation.

Reading the Retained Seller Obligation provision of the PSA as written and considering that provision within the context of the entire PSA, and in particular, the Assumed Obligation provision, its language can be given a clear and definite legal meaning. Under PSA sections 11.1(a) and (b), Talisman and Statoil are

14

required by the PSA to indemnify Enduring only for damages incurred arising out of or resulting from the Assumed Obligations. Having determined that the Moon claims fall under the Retained Seller Obligation provision of the PSA, we conclude that Talisman and Statoil had no obligation under the PSA to indemnify Enduring for its settlement of the Moon claims because the Moon obligation was excluded from the Assumed Obligation provision of the PSA.

We further conclude that the only reasonable interpretation of the contract language at issue here is that the parties intended for the Retained Seller Obligations to include the Moon claims because they are third person claims brought within twelve months of closing and related to the use, ownership, and operation of the Assets during the time prior to closing. Because the Moon claims fall within the PSA's Retained Seller Obligations, we hold that the trial court erred in concluding that Talisman and Statoil breached the PSA by not indemnifying Enduring for its settlement of the Moon claims. We further hold that the trial court erred in denying Talisman and Statoil's claim for a declaratory judgment.

We sustain Talisman and Statoil's first issue.

**Attorney's Fees**

In their second issue, Talisman and Statoil argue that because the trial court erred in denying their claim for a declaratory judgment, it further erred in not awarding them attorney's fees.

15

The parties stipulated that each side had incurred reasonable and necessary attorney's fees in the amount of $250,000 in connection with pursuing their dispute through trial and Enduring would incur $50,000 in reasonable and necessary attorney's fees for successfully defending this appeal.

In their original petition for a declaratory judgment, Talisman and Statoil sought recovery of their attorney's fees under the Declaratory Judgment Act ("DJA"). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 2008). The DJA provides that attorney's fees may be awarded to either party. *See id.*; *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009). A trial court's award of attorney's fees under the DJA is discretionary and such an award will not be overturned absent an abuse of that discretion. *Fort Bend Cnty. v. Martin-Simon*, 177 S.W.3d 479, 485 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

We note that rather than objecting to or disputing Talisman and Statoil's entitlement to attorney's fees, Enduring stipulated that $250,000 would constitute reasonable and necessary attorney's fees for trial. "A 'stipulation' is an agreement, admission, or other concession made in a judicial proceeding by the parties or their attorneys." *Fed. Lanes, Inc. v. City of Hous.*, 905 S.W.2d 686, 689 (Tex. App.—Houston [1st Dist.] 1995, writ denied). A stipulation constitutes a binding contract between the parties and the court. *Id.* In stipulating to the amount of reasonable

and necessary attorney's fees for trial, the parties removed this issue of fact from the case. *See Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 161–62 (Tex. 2004); *El Paso Healthcare Sys., Ltd. v. Piping Rock Corp.*, 939 S.W.2d 695, 702 (Tex. App.—El Paso 1997, writ denied). However, because the award of attorney's fees in an action under the DJA is discretionary, the trial court must still determine Talisman and Statoil's entitlement to attorney's fees. *See Edwards Aquifer Auth. v. Chem. Lime, Ltd.*, 291 S.W.3d 392, 405 (Tex. 2009) ("Now that Chemical Lime is no longer the prevailing party, the trial court should have the opportunity to reconsider its award."); *SAVA Gumarska in Kemijska Industria d.d. v. Advanced Polymer Scis., Inc.*, 128 S.W.3d 304, 323–24 (Tex. App.—Dallas 2004, no pet.) ("[W]hen we reverse a declaratory judgment and the trial court awarded attorneys' fees to the party who prevailed at trial, we may remand the attorneys' fee award for reconsideration in light of our disposition on appeal."); *see also Crown Pine Timber 1, L.P. v. Durrett*, No. 12-11-00281-CV, 2012 WL 1623469, at *6–7 & n.3 (Tex. App.—Tyler May 9, 2012, no pet.) (mem. op.) (remanding case to trial court "so that it may determine the amount of attorney's fees, if any, to award to the parties under the Declaratory Judgment Act" even though parties previously stipulated attorney's fees amount).

Having held that the trial court erred in entering judgment for Enduring and denying Talisman and Statoil's claim for a declaratory judgment, we remand this

17

case to the trial court for a determination of whether Talisman and Statoil are entitled to an award of attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009.

We sustain Talisman and Statoil's second issue.

## Conclusion

We reverse the judgment of the trial court and render judgment that the obligation to pay the Moons is a Retained Seller Obligation under the PSA, Enduring is required to defend and indemnify Talisman and Statoil against the Moon claims, and Talisman and Statoil have no obligation under the PSA to defend or indemnify Enduring against the Moon claims. We remand the issue of attorney's fees to the trial court for further proceedings.

Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Sharp.