**Opinion issued December 17, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00967-CV

————————————

**SHAWN LYNN HALLSTED, Appellant**

**V.**

**KEVIN CHARLES MCGINNIS, Appellee**

---

**On Appeal from the 311th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-41950**

---

## O P I N I O N

Shawn Lynn Hallstead sued Kevin McGinnis, her former husband, claiming that he failed to comply with the provision of their agreement incident to divorce (AID) requiring him to make periodic alimony payments. As damages for her claim,

Shawn sought compensation calculated pursuant to the AID's default and acceleration clause.

The trial court held a bench trial and entered judgment denying Shawn's request for relief, and later, her motion for new trial. On appeal, Shawn contends that (1) the trial court erred in rendering judgment denying her claim for breach of the AID and in denying her motion for new trial; and (2) the judge who presided over the bench trial, who is no longer on the bench, engaged in judicial misconduct that prejudiced Shawn. We reverse and remand.

## BACKGROUND

Shawn and Kevin entered into their AID in March 2001, and the trial court approved and incorporated it into the parties' final decree of divorce. Article 3 of the AID obligated Kevin to pay monthly contractual alimony payments to Shawn. The parties dispute whether the AID obligated Kevin to make the monthly payments until January 2014 or whether it obligated him to pay "permanent" alimony, that is, until either Kevin or Shawn's death. They do not, however, dispute that Kevin complied with the contractual alimony payment provision until January 2010, when he stopped making the monthly payments.

2

## DISCUSSION

## I.     Breach of the Agreement Incident to Divorce

Shawn first claims that the trial court erred in denying her breach of contract claim, contending that the evidence is neither legally nor factually sufficient to support the trial court's rulings.

### A.     Standards of review

We review the sufficiency of the evidence supporting a trial court's challenged factual findings by applying the same standards that we use in reviewing the legal or factual sufficiency of the evidence supporting jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). When, as here, the appellate record includes the reporter's record, the trial court's factual findings, whether express or implied, are not conclusive and an appellant may challenge the legal and factual sufficiency of the evidence supporting them. *Zenner*, 371 S.W.3d at 314.

We review any legal conclusions drawn from the facts, whether express or implied, to determine their correctness. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). In an appeal from a bench trial, we review a trial court's legal conclusions de novo and will uphold them on appeal if the judgment

can be sustained on any legal theory supported by the evidence. *Id.*; *Zenner*, 371 S.W.3d at 314–15.

Because the parties do not dispute the facts salient to Shawn's claim for breach of the AID, we consider whether the trial court erred in impliedly concluding that the AID's periodic alimony payment provision was unenforceable as a matter of law.

## B.      Interpretation of agreement incident to divorce

The Family Code provides that, in a divorce proceeding, the parties may enter into an agreement incident to divorce concerning "the division of the property and the liabilities of the spouses and maintenance of either spouse." TEX. FAM. CODE ANN. § 7.006(a).  If the court approves the parties' agreement, it may set forth the agreement in full or incorporate the agreement by reference in the final decree. *Id.* § 7.006(b).  Once the trial court has approved the parties' agreement and made it part of the judgment, the agreement is no longer merely a contract between private individuals. *Ex parte Gorena*, 595 S.W.2d 841, 844 (Tex. 1979) (orig. proceeding). It becomes part of a valid and binding final judgment and is enforceable as part of the decree. *Id.*; *see Jenkins v. Jenkins*, 991 S.W.2d 440, 445 (Tex. App.—Fort Worth 1999, pet. denied); *Shoberg v. Shoberg*, 830 S.W.2d 149, 152 (Tex. App.—Houston [14th Dist. 1992, no writ).

An agreement incorporated into a divorce decree is a contract subject to the usual rules of contract interpretation. *See Broesche v. Jacobson*, 218 S.W.3d 267,

271 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). In construing an agreement incident to divorce, we look to the parties' intentions as manifested in the written agreement. *McPherren v. McPherren*, 967 S.W.2d 485, 490 (Tex. App.—El Paso 1998, no pet.), *cited in Kelley v. Kelley*, No. 14-04-00519-CV, 2015 WL 3799693, at *2 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (mem. op.); *see Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). To discern the parties' intent, we "examine and consider the entire writing in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis in original). No single provision, viewed in isolation, will be given controlling effect. *Id.*

The construction of an unambiguous contract is a question of law we review de novo. *Kachina Pipeline Co. v. Lillis*, 59 Tex. Sup. Ct. J. 23, 2015 WL 5889109, at *3 (Tex. Oct. 9, 2015) (citing *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)). When the written agreement is ambiguous, however, the parties' intent becomes a fact issue. *Id.* (citing *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)). Whether a contract is ambiguous is itself a question of law for the court. *Id.* (citing *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009)); *see Milner v. Milner*, 361 S.W.3d 615, 619, 622 (Tex. 2012) (determining issue of ambiguity of provision in mediated

5

settlement agreement under Family Code section 6.602(b) where parties offered conflicting interpretations but did not contend that agreement was ambiguous).

A contract is not ambiguous if it can be given a definite or certain meaning. *Coker*, 650 S.W.2d at 394; *Bishop v. Bishop*, 74 S.W.3d 877, 880 (Tex. App.—San Antonio 2002, no pet.). Ambiguity does not exist simply because the parties disagree over its meaning. *Dynegy Midstream Servs.*, 294 S.W.3d at 168; *see Kelley Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998) (holding that mere conflicting expectations or disputes are not enough to create ambiguity); *see also Consol. Petroleum Partners I, LLC v. Tindle*, 168 S.W.3d 894, 898–99 (Tex. App.—Tyler 2005, no pet.) (observing that courts cannot change contract simply because one party comes to dislike provisions or assigns different meaning to them). "An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations." *Am. Mfrs. Mut. Ins. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

## C.    Analysis

The parties dispute whether the agreement requires Kevin to make periodic alimony payments to Shawn until January 1, 2014, or alternatively, until one of their deaths. Because the interpretation of the agreement is a legal question, we first consider whether their conflicting interpretations demonstrate that the contract is ambiguous.

Article 3 of the AID provides:

## Article 3.
## Alimony

### 3.1 Purpose and Intent of Article

It is the mutual desire of the parties to provide a continuing measure of support for [Shawn], Receiving Party, after divorce. These support payments undertaken by [Kevin], Paying Party, are intended to qualify as contractual alimony, as that term is defined in section 71(a) of the Internal Revenue Code . . . . All provisions of this article will be interpreted in a manner consistent with that intention.

### 3.2 Terms, Conditions, and Contingencies

Amount – [Kevin] will pay to [Shawn] $2,500.00 per month as alimony. These payments will be payable on the 1st day [of the] month, beginning with the first payment on April 1, 2001.

In addition, [Kevin] will pay or provide directly to [Shawn] the following as additional alimony:

A. Ten percent (10%) of the gross amount of any bonuses paid to [Kevin] from his employment with the automobile dealership . . . ., so long as [Shawn] has not remarried or is not cohabitating with any adult of the opposite sex as that term is commonly determined by Texas law or statute.

B. During the next fourteen years, every two years, the cost of a new Cadillac Escalade from a franchise in which [Kevin] has an ownership interest, beginning with the first new vehicle provided April 1, 2001. . . .

The automobile will be in the name of [Shawn].

Upon [son]'s graduation from high school, [Kevin] shall provide a current model Escalade . . . at the time of [son]'s graduation . . . .

7

> [Shawn] agrees that she will allow Kevin the use of the vehicle as a trade-in on subsequent new vehicles. . . .
>
> *Term – Unless stated otherwise herein, the payments and obligations will end on January 1, 2014, with the last payment being due on January 1, 2014, providing all payments have been made.*
>
> Death of Receiving Party – [providing that alimony payment obligation terminates upon Shawn's death]
>
> Death of Paying Party – [providing that alimony payment obligation terminates upon Kevin's death]
>
> Insurance – [providing for Shawn to remain a beneficiary on Kevin's life insurance policy]
>
> Payment Procedures – [detailing procedures for transfer of the alimony payments from Kevin to Shawn].
>
> * * *

(Emphasis added).

The remaining provisions of Article 3 address the intended federal tax impact of "all alimony payments made under this article" (section 3.3); indemnification for any tax liability on the paying party as a result of the payments (section 3.4); nontransferability (section 3.5); and acceleration of payments due if the paying party defaults in making a "periodic alimony payment" for a period of more than 60 days (section 3.6).

The "Term" paragraph is indented like the immediately preceding paragraphs addressing "additional alimony," but, in contrast to those paragraphs, it has a

heading like the immediately subsequent paragraphs addressing termination of the entire alimony obligation and other matters.

The question before us is whether—as Kevin contends and the trial court impliedly concluded—the "Term" paragraph modifies only the "additional alimony" in Section B of Article 3.2 or both Section A and Section B. Kevin contends that the "Term" provision does not apply to Section A and that this construction results in the agreement requiring him to make alimony payments for his lifetime. He further argues that such a provision is unenforceable under Texas law; thus, he did not breach the AID when he discontinued making alimony payments in 2010. He points out that the "Term" provision is indented in the same manner as the provisions requiring additional alimony in Section B.

In contrast, Shawn contends that the "Term" paragraph applies to both the alimony payments and the additional alimony provisions in Sections A and B, which ended Kevin's contractual alimony payments on January 1, 2014; thus, the agreement was enforceable and Kevin breached it when he stopped making the alimony payments.

The express language of the contract supports the latter contention: "Term" applies to both the alimony payments and the additional alimony obligations. First, the term provision is not limited to additional alimony, nor does it specifically refer to some, but not all, "payments and obligations." Second, Article 3 uses the term

9

"payments" consistently in context to mean the periodic contractual alimony payments. This use of "payments" appears approximately 20 times throughout Article 3.

In harmony with this context, the "Term" paragraph refers to both "the payments and obligations." The immediately preceding paragraphs in Section B, which address additional alimony, do not use the term "payments." Because Section B lacks any reference to "payments," "obligations" as used in the "Term" paragraph reasonably refers to those additional alimony obligations. If we were to construe the "Term" paragraph as applying only to the additional alimony, "payments" as used in "payments and obligations" would be rendered meaningless. The document's language admits of only one reasonable interpretation, its inconsistency in indentation notwithstanding.

The parties' undisputed evidence, including the AID's unambiguous "Term" provision, proves as a matter of law that Shawn was entitled to receive the periodic contractual alimony payments until January 1, 2014. We therefore hold that the trial court erred in entering a take-nothing judgment against Shawn's claim for breach of the AID.

Even if Kevin's construction were the correct one, his further contention that the provision is unenforceable as a matter of public policy because it requires him to pay indefinite, "permanent" alimony is without merit. Although public policy limits

10

a *court's* authority to award alimony, Texas policies favoring freedom of contract and promoting the settlement of disputes allow divorcing *parties* to agree to support payments to a former spouse for any length of time, whether or not the obligation terminates on a date certain. *Allen v. Allen*, 717 S.W.2d 311, 313 (Tex. 1986) ("A marital property agreement, although incorporated into a final divorce decree, is treated as a contract and its legal force and meaning are governed by the law of contracts, not the law of judgments."); *Francis v. Francis*, 412 S.W.2d 29, 33 (Tex. 1967) (providing that if parties agree that husband will pay support to wife after divorce is granted, court's approval of agreement does not invalidate it as alimony); *see also Gym-NI Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (allowing waiver of implied warranty of suitability based on public policy requirement that parties "have the utmost liberty of contracting") (quoting *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 767 (Tex. 2005)). "[I]t has long been held that such [contractual] alimony agreements and other marital property agreements, even when incorporated into divorce decrees, are enforceable as contracts and governed by contract law." *McCullough v. McCullough*, 212 S.W.3d 638, 642–43 (Tex. App.—Austin 2006, no pet.); *see Key v. Key*, 307 S.W.3d 812, 814 (Tex. App.—Dallas 2010, no pet.) (declaring that "Chapter 8['s spousal maintenance provisions] do[] not apply to an alimony provision in a divorce decree that restates a parties' contractual agreement for alimony."); *see also Bruni v. Bruni*, 924 S.W.2d 366, 368 (Tex. 1996) (holding

11

that parties' agreement that former husband would provide child support until each child reached age of 21, which was incorporated into divorce decree, was, as matter of law, enforceable in contract) *Hurley v. Hurley*, 960 S.W.3d 287, 288 (Tex. App.—Houston [1st Dist.] 1997, no pet.) (explaining that parties' consent to property settlement made decree enforceable as contract, "even if it divests appellant of his separate property").

## CONCLUSION

We reverse the trial court's judgment and remand the case to the trial court for further proceedings consistent with this opinion. Given our resolution of the first issue on appeal, we need not address the second one. We deny all pending motions as moot.


Jane Bland
Justice

Panel consists of Justices Jennings, Keyes, and Bland.